255 N.J. Super. 552 (1991)
605 A.2d 776
STEPHEN BEUKAS, ET AL., PLAINTIFFS,
v.
THE BOARD OF TRUSTEES OF FAIRLEIGH DICKINSON UNIVERSITY, DEFENDANTS.
Superior Court of New Jersey, Law Division Bergen County.
Decided August 7, 1991.
*553 Gregory L. Russo for plaintiff Denichilo (Santo J. Bonanno & Associates, attorneys).
Michael Gross for plaintiffs Beukas, et al. (Gross & Gross, attorneys).
James L. Plosia, Jr. for defendant (Sills, Cummis, Zuckerman, Radin, Tischman, Epstein & Gross, attorneys).
EICHEN, J.S.C.
This is an action for damages based on an alleged contract between plaintiffs, who are former students at the College of Dental Medicine (hereinafter the "dental college") at Fairleigh Dickinson University (hereinafter "plaintiffs") against the Board of Trustees of the University (hereinafter "defendants"). *554 The action arises out of a decision by defendants to permanently close the dental college and terminate the Graduate Studies Program leading to a degree of Doctor of Dental Medicine (hereinafter a "D.M.D. degree") due to a financial exigency. As a result of the closing of the dental college plaintiffs were deprived of an opportunity to complete the program leading to the award of a D.M.D. degree from Fairleigh Dickinson University Dental College.
Plaintiffs commenced the instant action on April 25, 1989 by filing an order to show cause seeking a preliminary injunction to prevent the closing of the dental college. Following denial of their application for injunctive relief, the case was transferred to the law division, and the matter was tried without a jury, by consent, based on a written stipulation of facts and exhibits as well as a certification containing additional undisputed facts submitted by defendants. The following findings of fact are based on the foregoing.

FINDINGS OF FACT
At the time this dispute arose, Fairleigh Dickinson University maintained a private college of dental medicine in Hackensack, New Jersey. Defendants published an annual Graduate Studies Bulletin detailing the various graduate programs offered and an annual bulletin for the dental college. That bulletin sets forth the dental programs offered, the curriculum for each of the four years of courses, and the terms upon which acceptance and admission into the dental college and continuation of the program to completion would be conditioned. The Graduate Studies Bulletin contained, among other things, a reservation of rights provision as follows:
"The University reserves the right in its sole judgment to make changes of any nature in the University's academic program, courses, schedule, or calendar whenever in its sole judgment it is deemed desirable to do so. The University also reserves the right to shift colleges, schools, institutes, programs, departments, or courses from one to another of its campuses. The foregoing changes may include, without limitation, the elimination of colleges, schools, institutes, programs, departments, or courses, the modification of the content of any *555 of the foregoing, the rescheduling of classes, with or without extending the announced academic term, the cancellation of scheduled classes, or other academic activities. If such changes are deemed desirable, the University may require or afford alternatives for scheduled classes or other academic notification of any such change as is reasonably practical under the circumstances.... [Payment of tuition or attendance at any classes shall constitute a student's acceptance of the University's rights as set forth in this and the two preceding paragraphs.] (Emphasis added)
Completion of the entire curriculum of courses over a period of no less than four years was required for graduation and eligibility for the degree of Doctor of Dental Medicine. The opportunity to take the New Jersey Dental Boards, a requirement to practice dentistry in this state, was conditioned upon completion of the four year program. Fairleigh Dickinson's dental program was accredited by the Commission on Dental Accreditation, and approved by the New Jersey State Board of Dental Examiners.
Eighty-three students were accepted each year for the four year program leading to the D.M.D. degree. In order to be accepted into the dental college, each applicant was required to take the Dental Admission Test given by the Council on Dental Education of the American Dental Association, complete a written application from the American Association of Dental Schools Application Service, submit recommendations and transcripts, and be interviewed.
After completing the application process, plaintiffs were notified by defendants that they had been accepted into the dental college for the course of studies leading to the D.M.D. degree. Plaintiffs accepted defendants' offer, rejected alternative career options, notified defendants that they accepted the offer, paid defendants the tuition for the coming semester, took appropriate steps respecting alternative career options, arranged their affairs to enable them to attend the program offered by defendants, and entered into the course of studies beginning in September 1986, 1987 or 1988. All plaintiffs were enrolled as full time students in the four year program although tuition *556 was due and payable on a semester basis. No formal written contract was ever executed.
On January 26, 1989, Fairleigh Dickinson University President Robert H. Donaldson was informed by the Chancellor of Higher Education, T. Edward Hollander, that the Governor's budget had appropriated 25% less money for the dental college for the 1989-90 school year than the college had received in 1988-89.
On March 7, 1989 defendants and President Donaldson met with Governor Kean, who informed them that the dental college would receive no State aid after the 1989-90 school year because the Governor had made a policy determination that it could no longer fund both the University of Medicine and Dentistry of New Jersey and the dental college. State aid constituted 38.1% of the dental college's total budget for the 1988-89 school year. Due to this loss of aid, Fairleigh Dickinson University incurred a deficit of approximately $6,200,000 for the 1988-89 academic year. The university did not have funds available to make up for the loss of state aid to the dental college.
As a result, on March 28, 1989 President Donaldson recommended to defendants that the following action be taken: (1) that the process for consultation with faculty over closing of the dental college be initiated; (2) that the acceptance of a freshman class for the dental college for the 1989-90 school year be suspended; (3) that the search for a new dean for the dental college be suspended; (4) that the dental college be kept open so that certain students currently enrolled in their junior year at the dental college could complete their education during the 1989-90 school year; and (5) that the dental college close permanently in June 1990.
Meetings between university officials and dental college students to inform the students of the Governor's actions and President Donaldson's recommendations were held on March 27, April 11 and 12, 1989. On June 14, 1989 defendants *557 resolved that the dental college would be closed at the end of the 1989-90 school year.
In the spring of 1989 the university appointed Dr. Blaise Curcio, a dental college professor to coordinate and effectuate transfers of first, second and third year students. Dr. Curcio had a number of meetings with students to inform them of their transfer options and provide information concerning transfers. University officials reached agreements with the University of Medicine and Dentistry of New Jersey, Columbia University School of Dentistry, New York University School of Dentistry, Tufts University School of Dentistry, and Temple University School of Dentistry to accept Fairleigh Dickinson University dental students as transfer students during either the 1989-90 or 1990-91 school year. The dental students were offered two transfer choices: (1) they could transfer immediately for the 1989-90 school year, either to the five schools previously mentioned or to other accredited dental colleges; or (2) the dental college students could remain at Fairleigh Dickinson University for the 1989-90 school year and then transfer to one of the five schools listed above or to any other accredited dental college. If the students chose the second option, they would receive a tuition subsidy at the dental college of their choice. More specifically, the students would be provided money to make up the tuition difference between Fairleigh Dickinson University's dental college and the school the students transferred to for the 1990-91 school year. The source of these monies was the New Jersey Department of Health & Education.
Dental students were also offered additional clinical and academic instruction so as to facilitate their transfer to other dental schools. Finally, Fairleigh Dickinson University coordinated with the State Dental Accreditation Society to insure that the dental college retained its accreditation for the 1989-90 academic year.

*558 PRELIMINARY STATEMENT
Plaintiffs claim a contractual basis for their right to recover damages resulting from the closing of the dental school. They argue that a contract exists between the university and its dental students as reflected in the annual bulletins issued by the University and the dental college, as well as other publications of the university which they assert are "the controlling documents in their contractual relationship." They argue that when plaintiffs paid the first year's tuition, a complete and binding contract arose for the entire educational program culminating in a D.M.D. degree on the terms set out in the bulletins.[1] Plaintiffs further claim that defendants breached their contract with plaintiffs and that, notwithstanding any claim of financial exigency, defendants' performance was not excused under the contract doctrine of impossibility of performance. Therefore, plaintiffs argue they are entitled to an award of damages.
Defendants' position is that the doctrine of judicial deference to university autonomy in academic decisionmaking as set forth in Napolitano v. Princeton University Trustees, 186 N.J. Super. 548, 453 A.2d 263 (App.Div. 1982), requires the court to decline to interfere with defendants' administrative decision to close the dental college.[2]
Alternatively, defendants argue that even if the doctrine of judicial deference does not conclusively dispose of the issue, plaintiffs have no contractual relationship with defendants and, therefore, no cause of action exists upon which an award of *559 damages can be based. However, without conceding the existence of a contractual relationship, defendants argue that even if the court finds a valid contract to exist based on the bulletins and other documents, defendants had a right to close the dental college under the specific terms of their "contract" as set forth in the Graduate Studies Bulletin. In that bulletin the university reserved the right in its sole judgment to make changes of any nature in the university's academic program, including the elimination of any college, provided adequate notice was given to the students. Accordingly, defendants argue that if there is a contract between plaintiffs and defendants, then that provision is enforceable and, therefore, plaintiffs may not recover. Moreover, they contend that in activating the reservation of rights clause in the bulletin, they did so fairly and in good faith. Plaintiffs counter that such reservation of rights clause is unconscionable and constitutes an unenforceable adhesion contract.
Finally defendants contend that even if they are considered to be in breach of any contractual obligation to plaintiffs, the alleged breach should be excused by the doctrine of impracticability of performance.

CONCLUSIONS OF LAW
The issue before the court is whether, in determining to permanently close the dental college, defendants infringed upon any legal rights of plaintiffs which would entitle them to redress their grievances through an award of damages. Fairleigh Dickinson University is a private institution. In Napolitano, our Appellate Division explained the nature of the relationship between a private university and its students as follows:
"the student comes to the academic community (the university) seeking to be educated in a given discipline. The student pays a tuition which might, in some instances, represent a contractual consideration. The university undertakes to educate that student through its faculty and through the association of other students with that student and the faculty. Transcending that bare relationship *560 is the understanding that the student will abide by the reasonable regulations, both academic and disciplinary, that the student will meet with academic standards established by the faculty and that the university, on the successful completion of studies, will award the degree sought to the student. Such a relationship, we submit, cannot be described either in pure contractual or associational terms. In those instances where courts have dealt with the relationship of a private university to its students in contractual terms, they have warned against a rigid application of the law of contacts to students disciplinary proceedings...." (Emphasis added; 565-566)
Napolitano was an academic fraud case. There the trial court intervened on a limited basis to review Princeton University's decision following a disciplinary hearing where it was determined that plaintiff's degree would be withheld for a year on the grounds that she had committed plagiarism. Applying the legal principles that generally govern private associations, the Appellate Division agreed with the trial court's view of its role as limited to a determination of whether Princeton had substantially complied with its own regulations, whether the university's findings were supported by the evidence adduced at the disciplinary hearing and whether the penalty imposed was within Princeton's authority. (186 N.J. Super. at 563, 453 A.2d 263).
Whether this standard of review should be used to resolve a university-student conflict involving an administrative decision to terminate an academic or professional program on the grounds of financial exigency has not been addressed by any court in this State. However, at least one jurisdiction appears to have applied that principle as a basis for refusing to interfere with a university's autonomy where the relief sought was equitable in nature. See, In re Antioch, supra. But see, Eden v. Board of Trustees of State University, 49 A.D.2d 277, 374 N.Y.S.2d 686, 691 (1975), where "executive prerogative" was acknowledged, but rejected, due to arbitrariness in the administration's decision to cancel a new school for podiatric medicine because of financial problems after students had already been accepted, applying principles of estoppel. See also, Galton v. The College of Pharmaceutical Sciences, Columbia U., 70 Misc.2d 12, 332 N.Y.S.2d 909 (Sup.Court 1972) where the appellate *561 court remanded a suit for injunctive relief to the trial court for inquiry into the circumstances underlying the university's decision to terminate funding for the College of Pharmacy based on allegations of arbitrariness in the decisionmaking.
Although our Appellate Division in Napolitano appears to have accepted a modified standard of judicial deference for review of private university decisionmaking, that case involved the exercise of academic, rather than administrative or business judgment, as in the instant case. Based on my review of Napolitano and the out-of-state decisions that have considered the issue, I cannot conclude that judicial deference or even the Napolitano de novo type review is the appropriate standard for reaching a just determination in disputes of this nature. In fact, several jurisdictions have expressly recognized a cause of action for damages in such cases. See, In re Antioch, supra; Behrend v. State of Ohio, 55 Ohio App.2d 135, 379 N.E.2d 617 (1977); Peretti v. Montana, 464 F. Supp. 784 (D.Mont. 1979), reversed on other grounds, 661 F.2d 756 (9th Cir.1981). In two of those jurisdictions where courts have recognized a cause of action for damages, they appear to have done so on the basis of finding a contractual relationship between the university and its students, using the college catalog to imply the terms of the contract. See, In re Antioch, supra at 113; Peretti v. Montana, 464 F. Supp., supra at 786. (The "catalog contract" has been upheld notwithstanding attacks based upon lack of consideration, the statute of frauds and lack of mutuality of obligation. Id.) And one court has permitted students to recover for breach of an "implied contract" based not on the catalog "promise" but on the basis of verbal promises by the administration to the students that the School of Architecture would remain viable after it had lost its accreditation. See, Behrend, supra, 379 N.E.2d at 620-621, where the court found that because the administration itself had subverted the success of the re-accreditation process, its claim of financial exigency did not amount to an impossibility of performance.
*562 Although the result in each of the foregoing cases has not been questioned, the theoretical bases underlying these decisions have been criticized as lacking in a unified and legally consistent application of the law. See, Nordin, "The Contract to Educate: Toward a More Workable Theory of the Student-University Relationship" 8 Journal of College and University Law No. 2, 142, 179 (1980-1982); see also, Jennings, "Breach of Contract Suits by Students Against Post-Secondary-Education Institutions: Can They Succeed?" 7 Journal of College and University Law No. 3-4, 191, 217 (1980-81)
Thus, the questions before this court, although simply stated, are somewhat more complex to resolve: First, What are the obligations owed by and between a university and its students under circumstances where the university has unilaterally determined to terminate an entire college for financial reasons? Secondly, Are the obligations contractual, and if so, should classic contract doctrine be applied to resolve the conflict? If not, what is the best legal theory to resolve the conflict?
In this regard it is clear that Napolitano, a case involving academic fraud, did not expressly reject either the doctrine of judicial deference or the classic contract model as the theoretical framework for resolving university-student disputes in every case (emphasis added; 186 N.J. Super. at 566, 453 A.2d 263); however, Napolitano does caution against rigid application of contract theory. Id. No doubt this is because an action for breach of the so-called "catalog contract" does not parallel a typical action for breach of a commercial contract in every respect. See, Davenport, "The Catalog in the Courtroom" 12 Journal of College and University Law, No. 2, 201, 207 (1985) After all a university, in offering a program that culminates in a professional degree, is not in the used car business. On the other hand, it would be naive not to recognize that in the modern world the university is indeed engaged in big business, with the student as consumer of its services. See, Nordin, supra, 149-150.
*563 There are no New Jersey cases dealing with the legal effect of the college catalog in the administrative area; however, in Trustees of Columbia U. v. Jacobsen, 53 N.J. Super. 574, 148 A.2d 63 (App.Div. 1959), appeal dismissed 31 N.J. 221, 156 A.2d 251 (1959), cert. denied 363 U.S. 808, 80 S.Ct. 1243, 4 L.Ed.2d 1150 (1960), the court refused to recognize a cause of action for fraud in favor of a student and against Columbia University based on the alleged failure of the university to meet the quality of academic courses as was represented in the college catalog. In that regard, the court stated: "they [the courses in the catalog] add up to nothing more than a fairly complete exposition of Columbia's objectives, desires and hopes...." (53 N.J. Super. at 579, 148 A.2d 63)
The same argument could be made in construing the contents of defendants' bulletins with regard to the award of a D.M.D. degree following the successful completion by plaintiffs of the four-year required course of study: that is, by offering a four-year course of study culminating in the degree, defendants were merely expressing their "objectives, desires and hopes" and were not making an enforceable promise to plaintiffs to provide the degree no matter what the financial condition of the university.
In Galton, supra, plaintiffs sought a preliminary injunction to restrain the university from closing the College of Pharmacy. There the court avoided the issue of whether a contractual relationship existed between the students and the college. Instead the court stated:
"Students presently attending the College should not be peremptorily cast out of the College, and their education interrupted for an indefinite time, perhaps forever, if such action is arbitrary. Students are entitled to consideration from educational institutions who invite them to pursue their education in the halls of learning of such institutions. Upon admission of a student to a college there is some obligation on the part of the college to permit the student to continue his studies to graduation if willing and eligible to continue. .. . Of course, if circumstances beyond the control of the College, such as lack of finances, prevent the college from continuing, the issue is concluded. But there must be an opportunity to inquire into the basis of the determination." (Emphasis added; 332 N.Y.S.2d at 912)
*564 Thus in Galton there is no attempt to analyze the basis for the cause of action in contract terms; rather the court merely applies what is essentially an administrative law approach and asks "Was the decision arbitrary?"
I believe that in the absence of a showing of bad faith, arbitrariness or lack of prompt notice by defendants of their intention to close the dental college there is no purpose in forcing a contract analysis upon the relationship only to have the court reject whatever classic contract principle the court, in its discretion, thinks should not apply. See, Peretti, supra at 786.
But even if I were to apply a contract analysis to this case based on the terms of the university bulletins, there is no doubt that defendants reserved the right in their bulletins to eliminate any college within the university subject only to giving adequate notification to its students. Plaintiffs' response to this argument is that the clause is indefinite, gives too much power to the university and that even if defendants claim of financial exigency is true, it is legally insufficient under the doctrine of impossibility of performance as a basis for excusing defendants from performing their obligations to plaintiffs. This court does not agree, for contrary to plaintiffs urgings, Dworman v. Mayor and Bd. of Alderman, 370 F. Supp. 1056 (D.N.J. 1974) does not stand for the proposition that performance may never be excused when a party's default is the result of the failure of performance by a third party. To the contrary, Dworman recognizes that under New Jersey law the standard is one of reasonable foreseeability: "only those events that should have been in the contemplation of the contracting parties and thus were reasonably foreseeable as possible contingencies will not excuse performance." (370 F. Supp. at 1071) Under the stipulated facts in this case, plaintiffs do not suggest it was reasonably foreseeable that state funding would be withdrawn after the 1989-90 academic year so as to require defendants to have specifically provided *565 for that contingency in their bulletins. Therefore, whether the reservation of right provision in the bulletins is construed as a contractually enforceable provision between the parties (in which event there is no need to reach the impossibility of performance argument) or whether the court analyzes the case in terms of "reasonable foreseeability" with regard to the withdrawal of funding by the State (thus excusing defendants' failure to perform), the result would be the same  plaintiffs could not recover under an express contract theory.[3]
In any event, this court rejects classic contract doctrine to resolve this dispute. It is significant that in all of the out-of-state cases involving the elimination of a university program for reasons of financial hardship, the courts, in favoring the students, did so as the result of the university having acted unfairly or arbitrarily, whether the court analyzed the problem under traditional contract theory, principles of association law or the administrative law standard of arbitrary and capricious conduct. In each case it was necessary that a cause of action in favor of the students be found in order to prevent unjust detriment and to preserve, not only the students' expectations, but society's expectations as to what was just under the circumstances. In each case there was no mutual agreement or intent to promise; thus, it cannot be argued seriously that by registering in the four year dental college program, plaintiffs promised to fulfill the degree requirements and were, therefore, required to stay the four years, pay the tuition and receive the degree, any more than it could be argued that defendants, by offering the four year program culminating in the D.M.D. degree, obligated itself to confer the degree no matter what the future might bring. The only case that might be made for adhering to the classic contract model in this case is that without such a *566 finding the court could not imply a covenant of good faith and fair dealing.[4] However, to permit such legal fiction to continue would defeat the potential for developing a legally cohesive body of law for resolving administrative disputes of this type.[5]
The "true" university-student "contract" is one of mutual obligations implied, not in fact, but by law; it is a quasi-contract which is "created by law, for reasons of justice without regard to expressions of assent by either words or acts." West Caldwell v. Caldwell, 26 N.J. 9, 28-29, 138 A.2d 402 (1958), quoting from CORBIN ON CONTRACTS Section 19 (1952). A quasi-contract is not a true contract but arises because of considerations of equity and morality and is distinguished from an express contract or even one implied in fact which arises from mutual agreement and intent to promise. Id. This theory is the most efficient and legally consistent theory to resolve a university-student conflict resulting from an administrative decision to terminate an academic or professional program. The inquiry should be: did the university act in good faith and, if so, did it deal fairly with its students?
In this case, plaintiffs and defendants have stipulated that in deciding to close the dental college, defendants did not act arbitrarily, negligently or in bad faith. Plaintiffs appear to acknowledge that defendants could not continue the dental college without state funding. Nor is there any dispute that defendants acted other than in good faith both in giving adequate notice of their intentions to close the college and in arranging transfer and admission of plaintiffs to other dental schools in the area in order to avoid any disruption in their education. Under these facts and circumstances, it cannot be *567 said that defendants breached any obligations to plaintiffs. Any loss or detriment suffered by plaintiffs cannot be said to have been unjustly caused by defendants. "Injustice is always a fundamental aspect of quasi-contract recovery ... the essence of which is unjust detriment." CORBIN, supra at Section 19A, (1991 pocket part p. 65)
Had defendants acted arbitrarily; had they refused to avail themselves of reasonably available alternative funding; had they failed to promptly disclose the withdrawal of state funding; had they lulled plaintiffs into believing the funding would be restored; or had they failed to make proper arrangements for transfer of plaintiffs to other dental schools, thus causing a delay in plaintiffs' opportunities to pursue their educational goals, the situation would be different. But no one contends that defendants did anything but act promptly and forthrightly as soon as they learned of the change in their financial circumstances. Defendants made a reasonable decision to close the dental college because it could no longer operate in a fiscally sound or educationally responsible way after state funding was withdrawn. An institution involved in training health care professionals, where the conferral of a degree places the school's stamp of approval upon the student as qualified to practice the profession, see, Doherty v. Southern College of Optometry, 862 F.2d 570, 576 (6th Cir.1988), should be free to determine its ability to meet its educational responsibility so long as it does not act arbitrarily or in bad faith. This is because it has an obligation, not only to its students, but to the public at large. If due to a lack of financial resources, a dental school cannot meet its obligations to properly train its student body, then it is required to cease its function as a professional school without the risk of incurring liability to its students unless, of course, it acts arbitrarily or in bad faith in reaching its decision and does not deal fairly with its students in the process.
*568 In sum, this court concludes that applying quasi-contract theory to resolving university-student conflicts over an administrative decision to terminate a college or program for financial reasons is the most effective way to avoid injustice to both the university and its students. The judicial inquiry should be directed toward the bona fides of the decisionmaking and the fairness of its implementation: whether the institution acted in good faith and dealt fairly with its student body should be the polestar of the judicial inquiry. Cf. American Assoc. v. Univ. Prof. of Bloomfield College, 136 N.J. Super. 442, 346 A.2d 615 (App.Div. 1975). This approach will give courts broader authority for examining university decisionmaking in the administrative area than would a modified standard of judicial deference and will produce a more legally cohesive body of law than will application of classic contract doctrine with its many judicially created exceptions, varying as they must from jurisdiction to jurisdiction.
Based on all of the foregoing, I conclude that plaintiffs have failed to state a claim for damages in this action. Therefore, judgment is entered in favor of defendants dismissing the verified complaint. Defendants are directed to submit an order reflecting this decision within five days on notice to plaintiffs.
NOTES
[1] For this proposition plaintiffs rely on Neidermeyer v. Curators of University of Missouri, 61 Mo. App. 654 (Kan.City App. 1895). But see, Aase v. State of So. Dakota, 400 N.W.2d 269 (S.D. 1987) holding that students have no enforceable contract right against a university arising out of closing of a school as the only contract between the students and the school was for the term for which tuition was paid.
[2] For this proposition, they essentially rely on In re Antioch University, 418 A.2d 105, 113 (D.C.App. 1980).
[3] As for plaintiffs' argument that the reservation of rights clause is unconscionable, this court, even if it found a contract to exist, would decline to construe the reservation of rights clause in the Graduate Studies Bulletins as an adhesion contract as urged by plaintiffs.
[4] It is widely acknowledged that absent a contract, there can be no breach of the implied covenant of good faith and fair dealing. Noye v. Hoffmann-La Roche, 238 N.J. Super. 430, 434, 570 A.2d 12 (App.Div. 1990).
[5] The court is not here concerned with the less complex issues involved in resolving tuition disputes. See, The Princeton Montessori Society, Inc. v. Leff, 248 N.J. Super. 474, 591 A.2d 685 (App.Div. 1991).