776 A.2d 903 (2001)
342 N.J. Super. 399
Christopher J. McKELVEY, Plaintiff-Appellant,
v.
Rev. William C. PIERCE, Individually; Rev. John T. Frey, Individually; Rev. William P. Brennan, Individually; Rev. Anthony J. Manuppella, Individually; Estate of Rev. Msgr. William J. Buchler, Individually; Diocese of Camden, a religious corporation, Defendants-Respondents.
Superior Court of New Jersey, Appellate Division.
Argued May 23, 2001.
Decided July 5, 2001.
*905 Stephen C. Rubino, Westmont, argued the cause for appellant (Ross & Rubino, attorneys; Mr. Rubino and Jennifer B. Barr, Houston, TX, on the brief).
Martin F. McKernan, Jr., Camden, argued the cause for respondents (McKernan, McKernan, & Godino, attorneys; Mr. McKernan, of counsel and on the brief).
Before Judges KING, COBURN and AXELRAD.
*904 The opinion of the court was delivered by KING, P.J.A.D.
This is an unprecedented action at common law for breach of a contract for education brought by a former Roman Catholic seminarian. He sues the Diocese of Camden (Diocese) and several of its priests claiming he was persistently subjected to unwanted homosexual advances during his eight to nine years of seminary training. He asserts that despite his complaints, his supervising priests and the Diocese did nothing to correct the situation. Plaintiff states "the core of [his] complaint is that he spent $69,000 and ten years of his life and does not have a meaningful career because his teachers and mentors behaved sexually inappropriately towards him and breached the contract for education." He does not seek reinstatement in the program but seeks money damages for his loss of time and out-of-pocket costs.
The Law Division judge dismissed his complaint. The judge concluded that entertaining plaintiff's action would violate the First Amendment's Religion Clauses, would require the court to intrude into church polity and administration, and would generate excessive entanglement of church and state. We agree and affirm.

I
On March 12, 1999 plaintiff filed suit in Superior Court, Law Division, Atlantic County, against defendants Rev. William C. Pierce, Rev. John T. Frey, Rev. William P. Brennan, Rev. Anthony J. Manuppella, the Estate of Rev. Msgr. William J. Buchler, and the Diocese of Camden, alleging breach of an implied contract by the creation of a hostile education and work environment, breach of the covenant of good faith and fair dealing, intentional infliction of emotional distress, and for fraud and deceit. He demanded a jury trial. By court order on July 9, 1999 the complaint was dismissed for lack of subject matter jurisdiction, with plaintiff's right to file an amended complaint.
Plaintiff filed an amended complaint on August 13, 1999 alleging the same four causes of action. By court order on November 19, 1999 the complaint was again dismissed for lack of subject matter jurisdiction. On November 29, 1999 plaintiff filed a second amended complaint, again alleging the same four causes of action. Defendants demanded that plaintiff produce certain documents referred to *906 in his new complaint. These documents were produced.
On March 24, 2000 the judge heard argument on defendants' motion to dismiss. By order of April 27, 2000 the judge denied the motion without prejudice, and ordered plaintiff to provide defendants with a new statement setting forth the basis for his claims and any correspondence to support the purported contract between the parties. Defendants were ordered to provide plaintiff with all pertinent correspondence contained in the files of the Diocese of Camden.
On June 29, 2000 the judge issued a written opinion granting defendants' motion to dismiss plaintiff's second amended complaint for lack of subject matter jurisdiction. The defense never filed an answer. The motion by defendants for judgment on the pleadings, R. 4:6-2(e), effectively became a motion for summary judgment. R. 4:46-2; see Pressler, Current N.J. Court Rules, comment 4.1 on R. 4:6-2(e)(2001).

II
In January 1985 plaintiff made inquiry of the Diocese regarding his interest in becoming a Roman Catholic priest. Plaintiff was provided with a brochure entitled "The Diocesan Priesthood." On the title page of this brochure, this quote from the Acts of the Apostles appeared: "You will receive the power of the Holy Spirit ... you will be my witness."
The second page of the brochure is separated into portions entitled "To be," "To hear," "To live," and "To serve." The brochure stated that a diocesan priest in the Roman Catholic Church is one particular calling that Christian men may choose as their way of responding to and living their belief in Jesus Christ. Hearing the call of the Lord is to experience a deep and personal stirring within oneself. "In proclaiming God's Word, celebrating the sacraments, living as a public witness of Jesus and shepherding the People of God with care and compassion, the diocesan priest seeks to follow the Lord Who came `as One Who serves.'" To live as a diocesan priest, an individual is challenged to model his life on Jesus. The diocesan priest is celibate, yet "stands at the heart of the Catholic family." The celibate lifestyle "reminds him that his deepest meaning and fulfillment is found in relationship to the Lord." "The ministry of the diocesan priest is to lead and empower the community through a life which gives witness to the Gospel of Jesus Christ."
The brochure also describes the application process. During the time of application, "prudent sensitivity" is employed in order to respect the power of the Holy Spirit in a person's life. The described Revised Code of Canon Law suggests that each applicant for the priesthood meet certain minimum requirements in the area of spirituality, motivation, intelligence, physical and emotional health, and the capacity to relate to others.
Following an initial meeting with the Vocation Director of the Diocese, an applicant completes an application form and submits written recommendations, ecclesiastical records, academic transcripts, and the results of psychological and physical examinations. The applicant would then meet with four members of the Vocation Office Advisory Board, after which a recommendation would be made to the Bishop.
If the applicant is a viable candidate, he is assigned to a place of study in a formation program in a seminary. Seminary life is intended as a time of "vital, dynamic growth and development." The goal of the seminary is to form true pastors of the People of God after the model of Our Lord *907 Jesus Christ. At the four-year college level, the seminary assists a person to mature as a liberally-educated human being. A college seminarian is invited to reflect upon his personal commitment to God and his decision to involve himself in a life of service within the Church.
Upon graduation from the college seminary, the applicant is assigned to a school of theology for the final four years of his academic training. During these four years, the seminarian continues to grow in "holiness and wholeness." The ninth and final year of formation, prior to ordination to the priesthood, is an important year of transition from the seminary to the Diocese. At the completion of this year of internship, the candidate petitions the Bishop for ordination.
As part of his application process, plaintiff met with Rev. Joseph Perreault, Director of Vocations of the Diocese. He then met with and was interviewed by four priests from the Diocese. On April 16, 1985 plaintiff was notified of his conditional acceptance as a candidate for the priesthood. He was required to begin college studies at Saint Pius X Seminary in Dalton, Pennsylvania, associated with nearby University of Scranton. After one year, his progress would be reviewed and a further recommendation would be made.
Plaintiff attended St. Pius X Seminary until 1989. The seminary was affiliated academically with the University of Scranton, a Jesuit institution from which plaintiff obtained an A.B. degree in 1989, according to defense counsel's representation at oral argument. From 1989 to 1993, he attended St. Charles Borromeo Seminary, a theology seminary and divinity school in Wynnewood, Pennsylvania operated by the Diocese of Philadelphia. When not at St. Charles, plaintiff was assigned in the summers to work as an intern at the Holy Family Church in Grenloch, New Jersey in 1990 and 1992; after graduating from St. Charles Seminary in 1993, he interned at Our Lady of Lourdes in Glassboro, New Jersey, and at the Church of the Incarnation in Mantua, New Jersey.
In November 1993 the Diocese granted plaintiff's request for a voluntary leave of absence. When he did not return, the Diocese terminated its sponsorship of plaintiff as a candidate for the priesthood in August 1995. Plaintiff asserts that he applied to the Trenton Diocese for admission to its program for ordination into the priesthood but was turned down in November 1995.
The financial aspect of plaintiff's claim for out-of-pocket expenses is not completely clear on this record. In January 1986 Auxiliary Bishop Schad wrote to plaintiff's mother that "at the present time, the actual costs for college education of Camden seminarians is over $28,000." The declared Diocese policy at this time was that the student was responsible for $8,000. Students were eligible for the Guaranteed Student Loan Program. The Bishop's letter assured that "all tuition, room and board costs at the graduate level are paid for by the Diocese of Camden." Nothing was mentioned in Bishop Schad's letter about plaintiff's repayment obligation, if any, on withdrawal. Following plaintiff's termination Rev. John T. Frey, Director of Vocations, sent a letter to plaintiff which stated in pertinent part:
With this letter I am also informing you of your indebtedness to the Diocese of Camden for the years you were a candidate. The total is $69,002.57. This represents combined tuition, books, fees from the University of Scranton and St. Charles Borromeo Seminary ($51,791.10) and personal loans, including counseling ($17,231.47).
Please write to Father Marucci and communicate to him how you plan on *908 honoring this indebtedness; how much each month you can afford to send to the Diocese of Camden, 1845 Haddon Avenue, Camden, New Jersey 08103. Please make checks payable to the Diocese of Camden.
Neither party asserts any repayment by the plaintiff to the Diocese to date. In his brief, plaintiff states "as a result of many years as a student in the priest formation program, he incurred a student loan debt in the amount of $69,000." His appendix includes a defaulted student loan balance statement of $37,998.90, inclusive of interest, owed to Payco General American Credits, as of an unspecified date. At oral argument Mr. McKernan, defense counsel, represented to us that the Diocese has not sued plaintiff for any sum and does not intend to sue him. This is the extent of the financial relationship between the parties disclosed by the record.
Plaintiff did not sue defendants until 1999. He sued in contract, not under the New Jersey Law Against Discrimination or federal Title VII. According to plaintiff's second amended complaint, St. Charles Borromeo Seminary in Wynnewood, was charged with providing him the required education, under the supervision and direction of the Diocese. He claimed the Diocese and its employees made at least implied representations that his educational program would be free of exposure to extramarital sexual conduct, deviant sexual conduct, and sexual harassment. Instead, plaintiff alleged that defendants provided an atmosphere in which they and their employees "fostered, tolerated, permitted and encouraged inappropriate sexual conduct which included, but was not limited to, persistent and frequent demands whereby plaintiff was subjected and exposed to unreasonable, unlawful, immoral homosexual and other deviant discussions and/or contact."
In particular, plaintiff alleged that, while living in one rectory of the Diocese, one defendant repeatedly confronted plaintiff in order to discuss his homosexual lifestyle and to importune plaintiff to accompany him to gay bars. That same defendant also attempted to draw plaintiff into discussions of masturbation, homosexuality, and other deviant sexual acts. Plaintiff states he reported this misconduct to defendant Frey, the vocation director of the Diocese and the supervisor of both plaintiff and the defendant making the overtures. Frey failed to take any corrective action.
Another defendant, also plaintiff's supervisor, attempted to engage plaintiff in sexually related topics, including deviant and homosexual acts. Following this defendant's death, plaintiff was assigned to the supervision of another defendant. According to plaintiff, this defendant acted in an abusive and hostile manner and created a hostile working, residential, and educational environment and failed to prevent further abusive conduct by other defendants.
Plaintiff also claims another defendant was assigned to him as a mentor and spiritual director. That defendant informed plaintiff that he too was homosexual and invited plaintiff to go dancing with him at gay bars and to accompany him to the gym.
As a result of this conduct, and by subjecting him to an unreasonably hostile and unacceptable work, residential and educational environment, plaintiff alleged that defendants breached a contract (count one), breached a fiduciary duty and an implied covenant of good faith and fair dealing (count two), intentionally inflicted emotional distress (count three), and engaged in fraud and deceit (count four). As noted, plaintiff sought damages in the form of reimbursement for his tuition costs and student loans, as well as damages for his emotional suffering, loss of employment, *909 and loss of employability as a Roman Catholic priest.
In dismissing plaintiff's original complaint, the judge concluded that the First Amendment prohibited judicial resolution of the dispute insofar as it alleged violations of religiously-imposed obligations. That is, because the complaint asserted an invasion of plaintiff's rights to be treated according to the doctrines of the Catholic Church, it necessarily involved an inquiry into the extent and meaning of Church doctrine. To the extent the complaint also alleged violations of secular law, the judge was not sure what law was implicated. The judge found that the asserted violations of defendants' duty to provide plaintiff with an educational atmosphere free of unwanted sexual pressure and innuendo had been couched only in terms of violations of Church teaching. Hence, he gave plaintiff the opportunity to amend his complaint to assert claims in a non-religious context.
In amending his complaint, plaintiff relied on the mission statement, i.e., the brochure given to him when he first inquired about the priesthood, and argued that neutral principles of law could be applied to determine whether defendants had breached any contractual or fiduciary duty to him. The judge disagreed. He ruled that no document promised seminary students they would be free from unwanted sexual advances, and that the only way to determine whether such a promise was implicitly contained in defendants' brochure or other publications was to parse the religious documents, a procedure prohibited by the First Amendment.
Following the second amendment of plaintiff's complaint, the parties engaged in further discovery. In the course of this discovery, plaintiff obtained a copy of the student handbook used at the time he attended St. Charles Borromeo Seminary in Wynnewood. According to this handbook, seminarians were expected to refrain from dating (defined as extending an invitation to another person for romantic purposes). Plaintiff also obtained a copy of a statement issued by Bishop McHugh of the Camden Diocese in June 1993 in response to sexual abuse charges made by other persons against the Diocese. According to the Bishop's statement, the Church vehemently opposed all sexual misconduct, including "sexual misconduct with an adult," especially by clergy and others in Church positions. The Bishop stated there was no tolerance of any type of sexual behavior on the part of priests in the Diocese. According to Church guidelines regarding charges of sexual molestation, which were issued in August 1993, this proscribed conduct included "sexual misconduct with an adult, or any public action contrary to Church law or teachings regarding sexual behavior."
Following this exchange of discovery, defendants again moved to dismiss the complaint and plaintiff moved for an order compelling additional discovery. In granting defendants' motion, the judge found that none of the documents on which plaintiff relied demonstrated any legally enforceable contract between him and the Diocese and that, in any event, the judge would be called upon to interpret what were essentially religious documents. To attempt a purely secular interpretation of these documents could only lead to violations of the First Amendment, the judge concluded.
The judge was not convinced that even a purely secular contract could support a cause of action if the requested relief related to a plaintiff's inability to become a priest. The judge also was satisfied that none of the additional documents requested by plaintiff were reasonably calculated to lead to the discovery of evidence that a *910 contract between plaintiff and defendants existed.

III
Plaintiff argues that the judge erred in dismissing his complaint on First Amendment grounds because resolution of the dispute would not involve government's excessive entanglement with religion and because neutral principles of law could be applied to adjudicate his claims. In addition, he argues that an evidentiary hearing was necessary to determine whether resolution of the dispute involved adjudication of religious as opposed to secular issues and that the judge prematurely dismissed the complaint without allowing discovery to proceed.
According to the First Amendment to the Constitution, "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. Const. amend. I. According to the New Jersey Constitution, "[t]here shall be no establishment of one religious sect in preference to another...." N.J. Const. art. I, ¶ 4. The First Amendment's Religion Clauses are applicable to the states by the Fourteenth Amendment. Everson v. Bd. of Educ. of Ewing Tp., 330 U.S. 1, 15, 67 S.Ct. 504, 511, 91 L.Ed. 711, 723 (1947) (establishment clause); Cantwell v. Connecticut, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213, 1218 (1940) (free exercise clause).
Because the Religion Clause in the New Jersey Constitution is "less pervasive" than the federal provision, our courts have not interpreted the State Constitution more broadly; the interpretation of our constitutional standard is informed by an understanding of federal constitutional doctrine. Ran-Dav's County Kosher, Inc. v. State, 129 N.J. 141, 151, 608 A.2d 1353 (1992), cert. denied sub nom. Nat'l Jewish Comm'n on Law & Public Affairs v. Ran-Dav's Cty. Kosher, Inc., 507 U.S. 952, 113 S.Ct. 1366, 122 L.Ed.2d 744 (1993). "As the federal jurisprudence concerning the Religion Clauses now stands, there is no need to consider whether our State Constitution affords greater religious protection than that afforded by the First Amendment." South Jersey Catholic School Teachers Org. v. St. Teresa of the Infant Jesus Church Elementary Sch., 150 N.J. 575, 586, 696 A.2d 709 (1997).
The Establishment Clause prohibits government from promoting or affiliating itself with any religious doctrine or organization, from discriminating on the basis of religious beliefs or principles, from delegating governmental power to religious institutions, or from involving itself too deeply in the affairs of religious institutions. County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter, 492 U.S. 573, 590-91, 109 S.Ct. 3086, 3099, 106 L.Ed.2d 472, 492-93 (1989). Our courts have adopted the three-part test enunciated in Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), for analyzing whether government action violates the Establishment Clause. To avoid Establishment Clause problems, the statute or conduct in question must have a secular purpose; its principal effect cannot either advance or inhibit religion; and the statute or conduct must not foster excessive government entanglement with religion. Id. at 612-13, 91 S.Ct. at 2111, 29 L.Ed.2d at 755; accord South Jersey v. St. Teresa, 150 N.J. at 588, 696 A.2d 709; Ran-Dav's v. State, 129 N.J. at 152-53, 608 A.2d 1353.
The entanglement prong of the test forbids not only government adoption and enforcement of religious law, it also forbids government resolution of religious disputes. Ran-Dav's v. State, 129 N.J. at 158, 608 A.2d 1353. However, courts may *911 resolve controversies involving religious issues if resolution can be achieved by reference to "neutral principles of law" without interpretation of any religious doctrine. F.G. v. MacDonell, 150 N.J. 550, 559, 696 A.2d 697 (1997); Ran-Dav's v. State, 129 N.J. at 162, 608 A.2d 1353. Neutral principles of law are wholly secular legal rules whose application to religious parties or disputes does not entail theological or doctrinal evaluations. F.G. v. MacDonell, 150 N.J. at 559, 696 A.2d 697; Ran-Dav's v. State, 129 N.J. at 161-62, 608 A.2d 1353; Welter v. Seton Hall Univ., 128 N.J. 279, 292, 608 A.2d 206 (1992); Elmora Hebrew Ctr., Inc. v. Fishman, 125 N.J. 404, 414-15, 593 A.2d 725 (1991).
Only when the underlying dispute turns on religious doctrine or polity, will courts refuse to enforce secular rights. F.G. v. MacDonell, 150 N.J. at 559-60, 696 A.2d 697; Welter v. Seton Hall, 128 N.J. at 293, 608 A.2d 206. Any "[j]udicial deference beyond that demarcation would transform our courts into rubber stamps invariably favoring a religious institution's decision regarding even primarily secular disputes." Welter v. Seton Hall, 128 N.J. at 293-94, 608 A.2d 206. However, courts must "avoid questions of ecclesiastical polity or doctrine and should ordinarily defer to recognized church authority on such questions." Elmora v. Fishman, 125 N.J. at 415-16, 593 A.2d 725. Ordinarily, a trial judge, when faced with such questions, should specify those issues which are religious and to be settled by religious authority and those issues which are civil and to be resolved by the court. Id. at 420, 593 A.2d 725. Identification of these issues may require full briefing and argument by the parties. Ibid.
Turning to the Free Exercise Clause, the purpose of this clause is to secure religious liberty by prohibiting any invasions by civil authority. Hence, infringement of the Free Exercise Clause is based on concepts of coercion. South Jersey v. St. Teresa, 150 N.J. at 593, 696 A.2d 709. To determine whether the government has coercively interfered with a religious belief, or has impermissibly burdened a religious practice, our courts use the test established by the United States Supreme Court in Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), and Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L. Ed.2d 965 (1963). South Jersey v. St. Teresa, 150 N.J. at 594, 696 A.2d 709.
According to this test, any incidental burden on the free exercise of religion may be justified only by a compelling state interest in the regulation of the subject within the State's power to regulate. Sherbert v. Verner, 374 U.S. at 406, 83 S.Ct. at 1795, 10 L.Ed.2d at 972; South Jersey v. St. Teresa, 150 N.J. at 594, 696 A.2d 709; Gallo v. Salesian Soc'y, Inc., 290 N.J.Super. 616, 638, 676 A.2d 580 (App.Div.1996). A regulation neutral on its face may nevertheless, in its application, offend the requirement for neutrality if it unduly burdens the free exercise of religion. Wisconsin v. Yoder, 406 U.S. at 220, 92 S.Ct. at 1536, 32 L.Ed.2d at 28; South Jersey v. St. Teresa, 150 N.J. at 595, 696 A.2d 709. Ultimately, a balancing test is used to determine coercion. A judge should ask whether the claims are religious in nature, whether state action burdens exercise of the religion, and whether there is a state interest sufficiently compelling to override the right of free exercise. South Jersey v. St. Teresa, 150 N.J. at 595, 696 A.2d 709. In Employment Div., Dep't of Human Resources of Oregon v. Smith, 494 U.S. 872, 885, 110 S.Ct. 1595, 1603, 108 L.Ed.2d 876, 889 (1990), the United States Supreme Court held that the Sherbert-Yoder test is inapplicable to free exercise challenges to laws which are *912 across-the-board criminal prohibitions on a particular form of conduct. Although Congress thought it effectively had overruled the Smith decision in its enactment of the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C.A. § 2000bb to bb-4, the United States Supreme Court later held RFRA to be unconstitutional. City of Boerne v. Flores, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). Hence, the Smith standard is still viable in its sphere.
Application of these general principles to the case before us is difficult because the legal basis for plaintiff's claim against the Diocese and other defendants is non-traditional and unprecedented. Plaintiff has not sued for sexual harassment under the New Jersey LAD, N.J.S.A. 10:5-1 to -49, perhaps because of the two-year bar of the statute of limitations. See Montells v. Haynes, 133 N.J. 282, 627 A.2d 654 (1993). Plaintiff had not sued under Title VII of the federal Civil Rights Act for employment deprivations. See 42 U.S.C.A. § 2000e-2(a). His complaint is couched in the language of contract law, reinforced with claims for intentional infliction of emotional distress and misrepresentation, amounting to fraud and deceit.
We perceive no express contract here and the plaintiff asks us to imply a contract in law or in fact. In sum, we are asked to find a contractual obligation on the Diocese's part to provide a seminary and internship atmosphere, over the nine-year program, free from the distractions and undesirable conduct described by the plaintiff. Plaintiff, in effect, asks the court to establish and supervise a contractual relationship between a priest-in-training and the Diocese. We conclude that such an undertaking is simply too entangling, involving inquiry into the seminary's training program and legal monitoring of religious aspirants' and their peers' and superiors' sexual proclivities.
Plaintiff analogizes his cause of action to that brought in Beukas v. Board of Trustees of Fairleigh Dickinson Univ., 255 N.J.Super. 552, 605 A.2d 776 (Law Div. 1991), aff'd o.b., 255 N.J.Super. 420, 605 A.2d 708 (App.Div.1992), where the university terminated an ongoing course of study, dentistry, for financial reasons. In that case, the courts held that a university-student contract is one of mutual obligations implied by law, for reasons of justice, without regard to expressions of mutual assent. 255 N.J.Super. at 566, 605 A.2d 776. A court could thus inquire whether the school acted in good faith and dealt fairly with its students in its administrative decision to terminate the program. Id. at 568, 605 A.2d 776.
Plaintiff argues that he seeks the same inquiry into defendants' conduct in the manner in which defendants ran the educational program for seminarians. He asserts that his right to be free of sexual harassment and unwanted sexual advances is a right which can be implied by law into his agreement with the seminary to pay tuition and attend the program in exchange for his right to be educated to become a priest. He also asserts that the court would not have to engage in any interpretation of religious policy in adjudicating this cause of action, because the right to be free from sexual harassment is a purely secular right which has nothing to do with Church polity. This is all quite true, but a suit against a private university does not intrude into the operation of a seminary program, training aspirants for the priesthood, and presents no Religion Clause implications.
We find guidance in F.G. v. MacDonell, 150 N.J. 550, 696 A.2d 697 (1997), dealing with "clergy malpractice" in pastoral counseling and excessive entanglement with church affairs. The Court recognized a right of action for breach of a fiduciary *913 relationship against a clergyman who engaged in sexual relations with a parishioner who had sought counseling. The Court clearly stopped short of establishing a cause of action for clerical malpractice, 150 N.J. at 562, 696 A.2d 697, because of fear that the courts would become too entangled with church affairs, including the "training, skill, and standards applicable for members of the clergy in a diversity of religions with widely varying beliefs." Ibid. We encounter the same fear if we were to impose implied contract terms on the conditions of seminary training for priesthood candidates, absent a clear legislative command, such as the LAD in employment and public accommodation situations or Title VII in employment. And, we hasten to add, both of these remedial schemes have religiously-based exceptions. N.J.S.A. 10:5-12(a); 42 U.S.C.A. § 2000e-1.
Also instructive is Judge Drozdowski's opinion, McElroy v. Guilfoyle, 247 N.J.Super. 582, 589 A.2d 1082 (Law Div.1990), a suit by a priest against his Bishop and the Diocese to recover damages for the alleged breach of a promise to pay the priest's legal fees incurred in defense of criminal sexual offenses involving minors. Judge Drozdowski dismissed the complaint for lack of "jurisdiction of secular courts over disputes between a church and its clergy members." Id. at 584, 589 A.2d 1082. After all adornments are stripped from the dispute before us today, we have a contract dispute between a church and a clergyman approaching ordination, arising out of pre-ordination training. This is not standard fare for civil courts.
We agree with Judge Drozdowski when he said:
New Jersey courts have consistently followed the guidance of the United States Supreme Court in holding that secular courts may not interfere with a church's religious determinations concerning questions of discipline, faith or ecclesiastical law. Welter v. Seton Hall University, supra, 243 N.J.Super. [263] at 273, 579 A.2d 332; See Watson v. Jones, 13 Wall. 679, 80 U.S. 679, 681-682, 20 L.Ed. 666, 676 (1871). The intrusion of civil courts into the administration and polity of the church in attempting to define the obligations of clergy members would threaten the freedom of the church from secular entanglement. Alicea v. New Brunswick Theological Seminary, 244 N.J.Super. 119, 133-134, 581 A.2d 900 (App.Div. 1990). Indeed, such an inquiry into the history and customs of the church in defining the relationships between clergy members would constitute an "`establishment of religion' with a vengeance." Ibid. quoting Maryland and Virginia Eldership v. Church of God at Sharpsburg, 254 Md. 162, 254 A.2d 162, 170 (Md.Ct.1969), dism. for want of a substantial federal question 396 U.S. 367, 90 S.Ct. 499, 24 L.Ed.2d 582 (1970).
If we entertain plaintiff's suit here, our courts would have to imply the contractual terms relating to sexual advances by other seminarians and supervising priests because no such terms are explicit in the parties' undertaking. Implied contracts are products of the interpretation of words and conduct by judges or questions of law to be decided by a court. They are legal creations. Wanaque Borough Sewerage Authority v. West Milford, 144 N.J. 564, 574-75, 677 A.2d 747 (1996). A court would have to evaluate the truth and gravity of plaintiff's claims and the Diocese's defenses and decide whether or not the established facts constitute a substantial breach of contract in the seminary training, college and parish-internship context. If liability is found, a court would have to readjust the economic relationships *914 between the parties, presumably a cost-benefit analysis placed on the value of plaintiff's educational gains versus his lost opportunities and out-of-pocket costs, a daunting task and an essentially entangling one.
As Justice Clifford reminds us in Alicea v. New Brunswick Theological Seminary, 128 N.J. 303, 313, 608 A.2d 218 (1992), a tenure dispute between a faculty member and a religious seminary, factors for consideration on abstention from jurisdiction include "the clarity of contractual provisions relating to the employee's function" and "the threat of regulatory entanglement." Both factors cut against our accepting jurisdiction here. This dispute before us does not entangle the court with the doctrines of the Roman Catholic Church but certainly does entangle us with respect to the polity and administration of the Church. See Welter v. Seton Hall University, 128 N.J. at 292, 608 A.2d 206. In Chavis v. Rowe, 93 N.J. 103, 110-11, 459 A.2d 674 (1983), abstention was found proper where rights were unsettled under church polity. As Justice Clifford there said "insinuation by civil courts ... into the administration and the polity of the church in the hope of uncovering clues as to the correct disciplinary procedures, threatens the freedom of religious institutions from secular entanglement." Id. at 112, 459 A.2d 674. See also Elmora Hebrew Center, Inc. v. Fishman, 125 N.J. at 417, 593 A.2d 725 (duties of Orthodox rabbi properly arbitrated by Beth Din); Ran-Dav's County Kosher, Inc. v. State, 129 N.J. at 155, 608 A.2d 1353 (state regulations for kosher products violated Establishment Clause).
Plaintiff's claim here essentially is that the Diocese prevented him from becoming a priest by failing to address alleged sexual harassment effectively. His "future in the priesthood is at the heart of his claim. This directly implicates the minister-church relationship, an undisputed matter of core ecclesiastical concern." Bollard v. California Province of Society of Jesus, 211 F.3d 1331 (9th Cir.2000) (dissent from order denying petition for rehearing en banc by Judges Wardlaw, Kozinski, O'Scannlain and Kleinfeld); see also Bollard v. California Province of Society of Jesus, 196 F.3d 940 (9th Cir.1999) (allowing Title VII claim by Jesuit novice for sexual harassment as not violative of Establishment or Free Exercise Clause). To paraphrase the Ninth Circuit's four dissenters on the denial of the rehearing petition in Bollard, a decision to entertain plaintiff's action here would require the judicial branch to delve into religious matters outside our province, such as the conditions of the plaintiff's association with the Diocese; its disciplinary and supervisory decisions; whether plaintiff would have otherwise been ordained into the priesthood; and the extent to which he could be made whole from loss of a life of spiritual service, and the proper measure of compensation for the emotional pain he suffers from this deprivation. 211 F.3d at 1332. "`The ministerial exception [to Title VII] is a well-established compromise between two extremely important intereststhe interest in eradicating discrimination in employment and the right of a church to manage its religious affairs free from governmental interference.'" Id. at 1333.
We are most reluctant to entertain plaintiff's implied contract claim here for fear of encroachment on church administration and polity in a sensitive matter of considerable contemporary concern. See Garry Wills, Papal Sin 192-203 (Doubleday 2000).
Affirmed.