800 A.2d 840

CHRISTOPHER J. MCKELVEY, PLAINTIFF–APPELLANT, v. REV. WILLIAM C. PIERCE, INDIVIDUALLY; REV. JOHN T. FREY, INDIVIDUALLY; REV. WILLIAM P. BRENNAN, INDIVIDUALLY; REV. ANTHONY J. MANUPPELLA, INDIVIDUALLY; ESTATE OF REV. MSGR. WILLIAM J. BUCHLER, INDIVIDUALLY; AND DIOCESE OF CAMDEN, A RELIGIOUS CORPORATION, DEFENDANTS–RESPONDENTS, AND JOHN DOES 1–10 (A FICTITIOUS NAME FOR PERSONS AND/OR ENTITIES WHOSE IDENTITY OR CULPABILITY IS NOT PRESENTLY KNOWN), DEFENDANTS.

Argued February 26, 2002—Decided July 10, 2002.

28

*Stephen C. Rubino* argued the cause for appellant (*Ross & Rubino,* attorneys; *Mr. Rubino and Jennifer B. Barr Swift,* on the brief).

*Martin F. McKernan, Jr.,* argued the cause for respondents (*McKernan, McKernan & Godino,* attorneys).

The opinion of the Court was delivered by

LONG, J.

Plaintiff Christopher J. McKelvey, a former Roman Catholic seminarian, has sued the Diocese of Camden and a number of its priests, in contract and tort, claiming that he was regularly and persistently subjected to unwanted homosexual advances during his lengthy seminary training despite his complaints to supervisors at every level. According to McKelvey, he was forced to drop out before ordination due to the homosexual harassment, and is now without a meaningful career. The Superior Court dismissed McKelvey's complaint on the ground that adjudicating it would require intrusion into church polity and administration, excessively entangling church and state in violation of the Religion Clauses of the First Amendment. *U.S. Const.* amend. I. The Appellate Division affirmed that judgment.

We now reverse. The First Amendment does not immunize every legal claim against a religious institution and its members.

The analysis in each case is fact-sensitive and claim specific, requiring an assessment of every issue raised in terms of doctrinal and administrative intrusion and entanglement. In our view, the lower courts failed to engage in that kind of painstaking analysis and painted with too broad a brush when dismissing McKelvey's case in its entirety. We thus reverse and remand the case to the trial court to determine, on an issue-by-issue basis, whether any of McKelvey's claims may be adjudicated consistent with First Amendment principles.

## I

The history of this case is detailed in the opinion below, *McKelvey v. Pierce,* 342 *N.J.Super.* 399, 403–10, 776 *A.*2d 903 (App.Div.2001), and is incorporated as if more fully set forth. In brief, in 1999, McKelvey sued the Diocese of Camden (Diocese) and a number of priests (collectively, defendants) alleging breach of an implied contract by the creation of a hostile education and work environment, breach of the covenant of good faith and fair dealing, breach of fiduciary duty, intentional infliction of emotional distress, and fraud and deceit. He demanded a jury trial. That complaint and an amended version of it were dismissed for lack of subject matter jurisdiction. McKelvey filed a second amended complaint, again alleging the same causes of action.

After limited discovery, and without ever filing an answer, defendants moved to dismiss the second amended complaint. The motion by defendants for judgment on the pleadings, *R.* 4:6–2(d), effectively became a motion for summary judgment. *R.* 4:46–2; Pressler, *Current N.J. Court Rules,* cmt. 4.1 on *R.* 4:6–2(3)(2001).

The facts before the trial court, with the benefit of inferences in favor of McKelvey, the non-moving party, see *F.G. v. MacDonell,* 150 *N.J.* 550, 556, 696 *A.*2d 697 (1997), are as follows: In January 1985, McKelvey made inquiry of the Diocese regarding his interest in becoming a Roman Catholic priest. He was provided with a brochure entitled "The Diocesan Priesthood," which underscored celibacy as a required element for participation. The brochure

also described the application process, including an initial meeting with the Vocation Director of the Diocese; completing an application form; forwarding written recommendations, ecclesiastical records, and academic transcripts; undergoing psychological and physical examinations; and engaging in an interview process.

According to the brochure, upon acceptance, the applicant is assigned to a place of study in a formation program in a religious seminary. Included is a four-year college education. Upon graduating from the college seminary, the seminarian is assigned to a school of theology for the final four years of his academic training. The ninth and final year of formation, prior to ordination to the priesthood, is a year of transition from the seminary to the Diocese. At the completion of that year of internship, the candidate petitions the Bishop for ordination.

McKelvey initiated the process. As part of his application, he met with the Director of Vocations of the Diocese and later was interviewed by four priests. On April 16, 1985, the Diocese notified McKelvey of his conditional acceptance as a candidate for the priesthood. In January 1986, Auxiliary Bishop Schad wrote to McKelvey's mother that "at the present time, the actual costs for college education of Camden seminarians is over $28,000," of which the student would be responsible for $8,000. Students were eligible for the federal Guaranteed Student Loan Program. The Bishop's letter assured that "all tuition, room and board costs at the graduate level are paid for by the Diocese of Camden." Nothing was mentioned in Bishop Schad's letter about a repayment obligation, if any, upon withdrawal.

McKelvey attended St. Pius X Seminary until 1989. The seminary was affiliated academically with the University of Scranton, a Jesuit institution from which McKelvey obtained an A.B. degree in 1989. From 1989 to 1993, he attended St. Charles Borromeo Seminary, a theological seminary and divinity school in Wynnewood, Pennsylvania operated by the Archdiocese of Philadelphia. When not at St. Charles, he was assigned to work as an intern at the Holy Family Church in Grenloch, New Jersey in 1990 and

1992. After graduating from St. Charles in 1993, he interned at Our Lady of Lourdes in Glassboro, New Jersey, and at the Church of the Incarnation in Mantua, New Jersey.

The student handbook in use at the time McKelvey attended St. Charles Borromeo Seminary stated that seminarians were expected to refrain from dating (defined as extending an invitation to another person for romantic purposes). A 1993 statement issued by Bishop McHugh of the Camden Diocese (in response to sexual abuse charges made by other persons against the Diocese) stated that the Church vehemently opposes all sexual misconduct, including "sexual misconduct with an adult," especially by clergy and others in Church positions. The Bishop stated there was no tolerance for any type of sexual behavior on the part of priests in the Diocese. According to Church guidelines regarding charges of sexual molestation, which were issued in August 1993, proscribed conduct included "sexual misconduct with an adult, or any public action contrary to Church law or teachings regarding sexual behavior."

According to McKelvey, although the Diocese and its employees made implied representations that his educational program would be free of exposure to extramarital sexual conduct, deviant sexual conduct, and sexual harassment, defendants instead provided an atmosphere in which they and their employees "fostered, tolerated, permitted and encouraged inappropriate sexual conduct which included, but was not limited to, persistent and frequent demands whereby plaintiff was subjected and exposed to unreasonable, unlawful, immoral homosexual and other deviant discussions and/or contact." In particular, McKelvey alleged that while living in one rectory of the Diocese, one defendant repeatedly confronted him in order to discuss his homosexual lifestyle and to importune McKelvey to accompany him to gay bars. That same defendant also attempted to draw McKelvey into discussions of masturbation, homosexuality, and other sexual acts. McKelvey reported that misconduct to the vocation director of the Diocese (who was the supervisor of both McKelvey and the defendant making the

overtures). The vocation director failed to take any corrective action.

Another defendant, also McKelvey's supervisor, attempted to engage him in sexually related topics, including homosexual acts. Following that defendant's death, McKelvey was assigned to the supervision of another defendant, who apparently was aware that McKelvey had reported the sexual overtures of his predecessor. According to McKelvey, that defendant acted in an abusive and hostile manner; created a hostile working, residential, and educational environment; and failed to prevent further abusive conduct by other defendants. McKelvey also claims that another defendant, who was assigned to him as a mentor and spiritual director, informed McKelvey that he too was homosexual and invited McKelvey to go dancing with him at gay bars and to accompany him to the gym. (McKelvey does not claim that any priest or superior ever touched him in an improper way.)

In November 1993, the Diocese granted McKelvey's request for a voluntary leave of absence. When he did not return, the Diocese terminated his candidacy for the priesthood in August 1995. Following McKelvey's termination, Rev. John T. Frey, Director of Vocations, sent him a letter that stated, in pertinent part:

> With this letter I am also informing you of your indebtedness to the Diocese of Camden for the years you were a candidate. The total is $69,002.57. This represents combined tuition, books, fees from the University of Scranton and St. Charles Borromeo Seminary ($51,791.10) and personal loans, including counseling ($17,231.47).
>
> Please write to Father Marucci and communicate to him how you plan on honoring this indebtedness; how much each month you can afford to send to the Diocese of Camden, 1845 Haddon Avenue, Camden, New Jersey 08103. Please make checks payable to the Diocese of Camden.

Neither party acknowledges any repayment by McKelvey to the Diocese to date. At oral argument, defense counsel represented to the Court that the Diocese has not sued McKelvey for any sum and does not intend to sue him.

McKelvey's 1999 complaint alleged that, as a result of defendants' conduct, and by subjecting him to an unreasonably hostile

and unacceptable work, residential and educational environment, defendants breached a contract (count one), breached a fiduciary duty and an implied covenant of good faith and fair dealing (count two), intentionally inflicted emotional distress (count three), and engaged in fraud and deceit (count four). McKelvey sought damages in the form of reimbursement for his tuition costs and student loans, as well as damages for his emotional suffering, loss of employment, and loss of employability as a Roman Catholic priest.

The trial court ruled that none of the writings relied on by McKelvey demonstrated a legally enforceable contract and that, in any event, the court could not attempt a purely secular interpretation of those religious documents without violating the First Amendment.

The Appellate Division affirmed. Although recognizing that McKelvey's suit would not require it to interpret religious dogma, the panel concluded:

> [A] decision to entertain plaintiff's action here would require the judicial branch to delve into religious matters outside our province, such as the conditions of the plaintiff's association with the Diocese; its disciplinary and supervisory decisions; whether plaintiff would have otherwise been ordained into the priesthood; and the extent to which he could be made whole from loss of a life of spiritual service, and the proper measure of compensation for the emotional pain he suffers from this deprivation. . . .
>
> We are most reluctant to entertain plaintiff's implied contract claim here for fear of encroachment on church administration and polity in a sensitive matter of considerable contemporary concern.
>
> [*McKelvey, supra*, 342 *N.J.Super.* at 418–19, 776 *A.*2d 903 (internal citations omitted).]

We granted certification, 170 *N.J.* 388, 788 *A.*2d 773 (2001), and now reverse.

## II

McKelvey argues that his claims require no inquiry into faith, morals or religious polity but only court enforcement of a quasi-contract for education. *Beukas v. Board of Trustees*, 255 *N.J.Super.* 552, 556, 605 *A.*2d 776 (Law Div.1991), *aff'd o.b.*, 255 *N.J.Su-*

*per.* 420, 605 *A.*2d 708 (App.Div.1992). ·He claims that a disposition necessitates an intrusion into the operation of the seminary program "only to the extent that the Diocese would be required to refrain from doing that which common law, and now the LAD, already prohibits." In support of his breach of fiduciary duty claim, McKelvey cites *F.G. v. MacDonell,* 150 *N.J.* 550, 561, 696 *A.*2d 697 (1997), in which we held that the fiduciary duties owed by a cleric to a parishioner during the course of pastoral counseling could be defined without excessive entanglement with religious doctrine or polity.

Defendants counter that although the relationship between a student and university is generally a contractual one, a determination of a breach of an alleged "understanding" in a purported contract between McKelvey and the Diocese would amount to excessive entanglement in violation of the Establishment Clause of the First Amendment. They argue that "a judicial determination that the relationship between a seminarian in the priesthood formation program and his sponsoring diocese is a contractual one would set the stage for an unconstitutional imbroglio," resulting in the ability of either party thereto to enlist the courts in the enforcement of the terms and conditions of a religious denomination's ministerial training program—what the defendants contend amounts to a prohibited "union of civil and ecclesiastical control."

### III

In essence, both the trial court and the Appellate Division declined to decide whether McKelvey had an implied contract with the Diocese. That ruling arose out of the notion that mere consideration of that issue, without regard to outcome, is interdicted by the First Amendment. To assess the correctness of that view, it is necessary to set forth the relevant First Amendment standards.

The First Amendment "clearly bars government from involving itself in purely ecclesiastic matters, including, but not limited to church doctrine, hiring, firing and retention of church

employees and or ministers." *Weaver v. African Methodist Episcopal Church, Inc.,* 54 *S.W.*3d 575, 580 (Mo.Ct.App.2001) (citing *Serbian Eastern Orthodox Diocese for the U.S. and Canada v. Milivojevich,* 426 *U.S.* 696, 708–11, 96 *S.Ct.* 2372, 2380–88, 49 *L.Ed.*2d 151, 162–64 (1976)). However,

[a]pplication of this general principle[ ] . . . to all factual situations involving civil damage actions between members and the church, employees and the church, and clergy and the church has not been universally defined by the United States Supreme Court nor been unanimously agreed to by state and federal courts considering the issues. Perhaps nowhere has the discussion been as heated and diverse as in the area of sexual misconduct by clergy and the church's legal responsibility, if any. Sexual misconduct claims have arisen in both the contexts of injury to church members by clergy, as well as misconduct directed toward other general church employees and, in this case, misconduct by one member of the clergy toward another.

[*Weaver, supra,* 54 *S.W.*3d at 580–81 (footnote omitted).]

*See also Swanson v. Roman Catholic Bishop of Portland,* 692 *A.*2d 441, 446–47 (Me.1997) (Lipez, J., dissenting) (explaining that this is "an area of the law in which the U.S. Supreme Court cases offer limited guidance and there remains significant doctrinal uncertainty") (footnote omitted).

Strictly speaking, the Religion Clauses of the First Amendment, applicable to the states through the Fourteenth Amendment, forbid laws "respecting the establishment of religion, or prohibiting the free exercise thereof[.]" *U.S. Const.* amend. I. The defendants rely solely on the Establishment Clause, and not the Free Exercise Clause, as the basis for dismissing all of McKelvey's claims. Those clauses address different aspects of religious practice but, because they often are discussed simultaneously, are sometimes confused. *Van Osdol v. Vogt,* 908 *P.*2d 1122, 1126 (Colo.1996) ( "[T]he line between the two clauses can be indistinct and hard to define."); Zanita E. Fenton, *Faith in Justice: Fiduciaries, Malpractice & Sexual Abuse by Clergy,* 8 *Mich. J. Gender & L.* 45, 67 (2001). For that reason, it is necessary as a threshold matter to discuss the principles underlying both clauses, along with the Church Autonomy Doctrine and the "ministerial exception" to federal Title VII that have developed from the cases analyzing them.

A

As the United States Supreme Court has stated, "[t]he free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Employment Div. v. Smith,* 494 *U.S.* 872, 877, 110 *S.Ct.* 1595, 1599, 108 *L.Ed.*2d 876, 884 (1990). The Free Exercise Clause protects religious freedom by "embrac[ing] two concepts,—freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be. Conduct remains subject to regulation for the protection of society." *Cantwell v. Connecticut,* 310 *U.S.* 296, 303–04, 60 *S.Ct.* 900, 903, 84 *L.Ed.* 1213, 1218 (1940) (footnote omitted); *F.G., supra,* 150 *N.J.* at 559, 696 *A.*2d 697 ("A party challenging state action as violative of free-exercise rights must establish that the action produces a coercive effect on the practice of religion. The conduct at issue must have been part of the beliefs and practices of the defendant's religion.") (internal citations omitted). The Free Exercise Clause also provides institutional protection by forbidding governmental action from "encroaching on the ability of a church to manage its internal affairs." *EEOC v. Catholic Univ. of Am.,* 83 *F.*3d 455, 460 (D.C.Cir.1996) (citing *Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church in N. Am.,* 344 *U.S.* 94, 116, 73 *S.Ct.* 143, 154–55, 97 *L.Ed.* 120, 136 (1952) (noting that Free Exercise Clause protects power of religious organizations "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine")).

B

In contrast to the Free Exercise Clause, the Establishment Clause prohibits states from promoting religion or becoming too entangled in religious affairs, *County of Allegheny v. American Civil Liberties Union Greater Pittsburgh Chapter,* 492 *U.S.* 573, 590–91, 109 *S.Ct.* 3086, 3099, 106 *L.Ed.*2d 472, 492–93 (1989), such as by enforcing religious law or resolving religious disputes. *Ran–Dav's County Kosher, Inc. v. State,* 129 *N.J.* 141, 158, 608

*A.*2d 1353 (1992), *cert. denied sub nom., Nat'l Jewish Comm'n on Law & Public Affairs v. Ran–Dav's County Kosher, Inc.,* 507 *U.S.* 952, 113 *S.Ct.* 1366, 122 *L.Ed.*2d 744 (1993). The drafters of the First Amendment understood government "establishment" of religion to mean "sponsorship, financial support, and active involvement of the sovereign in religious activity." *Walz v. Tax Comm'n,* 397 *U.S.* 664, 668, 90 *S.Ct.* 1409, 1411, 25 *L.Ed.*2d 697, 701 (1970). The oft-cited *Lemon* test for determining whether a particular government action passes muster under the Establishment Clause requires that it must (1) have a secular purpose, (2) have a primary effect that neither advances nor inhibits religion, and (3) not foster excessive government entanglement with religion. *Lemon v. Kurtzman,* 403 *U.S.* 602, 612–13, 91 *S.Ct.* 2105, 2111, 29 *L.Ed.*2d 745, 755 (1971).

■ It is the excessive entanglement prong of *Lemon* that is at issue here. In subsequent applications of *Lemon,* the United States Supreme Court has explained: "Regardless of how we have characterized the issue, . . . the factors we use to assess whether an entanglement is 'excessive' are similar to the factors we use to examine 'effect'. . . . [I]t is simplest to recognize why entanglement is significant and treat it . . . as an aspect of the inquiry into a [law]'s effect." *Agostini v. Felton,* 521 *U.S.* 203, 232–33, 117 *S.Ct.* 1997, 2015, 138 *L.Ed.*2d 391, 420 (1997). Thus, the critical issue of effect or entanglement under the Establishment Clause "is measured by the 'character and purposes' of the institution affected, the nature of the benefit or burden imposed, and the 'resulting relationship between the government and the religious authority.' " *Rayburn v. General Conference of Seventh–Day Adventists,* 772 *F.*2d 1164, 1170 (4th Cir.1985) (footnote omitted) (quoting *Lemon, supra,* 403 *U.S.* at 615, 91 *S.Ct.* at 2112, 29 *L.Ed.*2d at 757), *cert. denied,* 478 *U.S.* 1020, 106 *S.Ct.* 3333, 92 *L.Ed.*2d 739 (1986).

■ When making such evaluations, courts examine two dimensions of entanglement under the Establishment Clause: substantive and procedural entanglement. *Bollard v. California Province of the Society of Jesus,* 196 *F.*3d 940, 948 (9th Cir.1999).

Substantive entanglement involves the same concerns as the Free Exercise Clause analysis and may occur, for example, when a "church's freedom to choose its ministers is at stake." *Id.* at 948–49. Thus, where a minister seeks redress for termination, failure to hire, changes in work schedule, or other similar decisions involving, at their heart, a church's core right to decide who (and in what manner he or she) may propagate its religious beliefs, the Establishment Clause clearly prevents review by a civil court. *Id.* at 946 ("A church's selection of its own clergy is one such core matter of ecclesiastical self-governance with which the state may not constitutionally interfere.") (citing *Milivojevich, supra,* 426 *U.S.* at 717, 96 *S.Ct.* at 2384, 49 *L.Ed.*2d at 167; *Kedroff, supra,* 344 *U.S.* at 116, 73 *S.Ct.* at 154–55, 97 *L.Ed.* at 136; *Gonzalez v. Roman Catholic Archbishop of Manila,* 280 *U.S.* 1, 6, 50 *S.Ct.* 5, 7–8, 74 *L.Ed.* 131 (1929)); *Gellington v. Christian Methodist Episcopal Church, Inc.,* 203 *F.*3d 1299, 1304 (11th Cir.2000) ("A church's view on whether an individual is suited for a particular clergy position cannot be replaced by the courts without entangling the government in 'questions of religious doctrine, polity, and practice.'") (quoting *Jones v. Wolf,* 443 *U.S.* 595, 603, 99 *S.Ct.* 3020, 3035, 61 *L.Ed.*2d 775 (1979)); *Schmoll v. Chapman Univ.,* 70 *Cal.App.*4th 1434, 83 *Cal.Rptr.*2d 426, 427–28 (1999) (holding that First Amendment bars judicial scrutiny of religious university's decision to reduce chaplain's hours and benefits); *cf. Welter v. Seton Hall Univ.,* 128 *N.J.* 279, 291, 295–96, 608 *A.*2d 206 (1992) (recognizing that court cannot constitutionally adjudicate claims concerning decision to hire or fire employees "charged with propagating the religion" but holding that nuns hired to teach computer science classes and who performed no ministerial functions were not barred by First Amendment from maintaining breach of express contract claim for their discharge).

Procedural entanglement, on the other hand, might result "from a protracted legal process pitting church and state as adversaries." *Rayburn, supra,* 772 *F.*2d at 1171; *see also NLRB v. Catholic Bishop of Chicago,* 440 *U.S.* 490, 502, 99 *S.Ct.* 1313,

1320, 59 *L.Ed.*2d 533, 542 (1979) ("It is not only the conclusions that may be reached by the Board which may impinge on rights guaranteed by the Religion Clauses, but also the very process of inquiry leading to findings and conclusions.") (footnote omitted). Additional procedural entanglement concerns may include a "far-reaching" impact of remedies on a church, such as the potential for "protracted government surveillance of church activities." *Bollard, supra,* 196 *F.*3d at 949.

 Recently, the United States Supreme Court explained: "Not all entanglements, of course, have the effect of advancing or inhibiting religion. Interaction between church and state is inevitable, ... and we have always tolerated some level of involvement between the two. Entanglement must be 'excessive' before it runs afoul of the Establishment Clause." *Agostini, supra,* 521 *U.S.* at 233, 117 *S.Ct.* at 2015, 138 *L.Ed.*2d at 420 (citing *Bowen v. Kendrick,* 487 *U.S.* 589, 615–17, 108 *S.Ct.* 2562, 2577–79, 101 *L.Ed.*2d 520, 544–46 (1988) (finding no excessive entanglement where government reviews adolescent counseling program set up by religious institutions that are grantees, reviews materials used by such grantees, and monitors program by periodic visits); *Roemer v. Board of Public Works,* 426 *U.S.* 736, 764–65, 96 *S.Ct.* 2337, 2353–54, 49 *L.Ed.*2d 179, 197–99 (1976) (finding no excessive entanglement where State conducts annual audits to ensure that categorical state grants to religious colleges are not used to teach religion)). "Judicial caveats against entanglement must recognize that the line of separation, far from being a 'wall,' is a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship." *Lemon, supra,* 403 *U.S.* at 614, 91 *S.Ct.* at 2105, 29 *L.Ed.*2d at 756–57.

## C

 The cognate "church autonomy doctrine" arose out of the Free Exercise Clause; freedom to select the clergy "must now be said to have federal constitutional protection as a part of the free exercise of religion against state interference." *Kedroff, supra,*

344 *U.S.* at 116, 73 *S.Ct.* at 154–55, 97 *L.Ed.* at 136–37 (footnote omitted). The doctrine has since been described as being rooted in *both* of the Religion Clauses to protect a church's freedom to regulate its own internal affairs by "prohibit[ing] civil court review of internal church disputes involving matters of faith, doctrine, church governance, and polity." *Bryce v. Episcopal Church in the Diocese of Colorado,* 289 *F.*3d 648, 655 (10th Cir.2002). The church autonomy doctrine is also based on "a long line of Supreme Court cases that affirm[s] the fundamental right of churches to 'decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.'" *EEOC v. Catholic Univ. of Am., supra,* 83 *F.*3d at 462 (quoting *Kedroff, supra,* 344 *U.S.* at 116, 73 *S.Ct.* at 154, 97 *L.Ed.* at 136).

For example, under the church autonomy doctrine, courts have recognized a "ministerial exception" to Title VII claims of sexual harassment brought by clergy members against churches because "[t]he right to choose ministers is an important part of internal church governance and can be essential to the well-being of a church." *Bryce, supra,* 289 *F.*3d at 656 (collecting cases and affirming dismissal of sexual harassment claim based on remarks about plaintiff-minister's homosexual activities made during ecclesiastical discussions on church policy towards homosexuals). The ministerial exception developed to protect churches from government action that interferes with a church's internal affairs management, such as the core right to choose and regulate members of its own clergy. *Gellington, supra,* 203 *F.*3d at 1301, 1303 (barring Title VII claim by minister alleging constructive discharge and retaliation after being reassigned to church 800 miles away from his home with substantial reduction in salary).

Although the church autonomy doctrine provides a shield against excessive government incursion on internal church management, it clearly cannot be applied blindly to all disputes involving church conduct or decisions. *Bryce, supra,* 289 *F.*3d at 657. The doctrine is implicated only in those situations where "the alleged misconduct is 'rooted in religious belief.'" *Ibid.*

(quoting *Wisconsin v. Yoder*, 406 *U.S.* 205, 215, 92 *S.Ct.* 1526, 1533, 32 *L.Ed.*2d 15, 25 (1972)); *see, e.g., Malicki v. Doe*, 814 *So.*2d 347, 361 (Fla.2002) (holding that First Amendment does not protect church against negligent hiring and supervision claim in connection with alleged sexual assaults by priest because alleged negligence "not rooted in religious belief"). "Of course churches are not—and should not be—above the law. Like any other person or organization, they may be held liable for their torts and upon their valid contracts." *Rayburn, supra*, 772 *F.*2d at 1171. Thus, the threshold inquiry is whether the underlying dispute is a secular one, capable of review by a civil court, or an ecclesiastical one about "discipline, faith, internal organization, or ecclesiastical rule, custom or law." *Bell v. Presbyterian Church (U.S.A.)*, 126 *F.*3d 328, 331 (4th Cir.1997) (citing *Milivojevich, supra*, 426 *U.S.* at 713, 96 *S.Ct.* at 2382, 49 *L.Ed.*2d at 165).

## IV

How other jurisdictions have applied those First Amendment principles in cases involving allegations of harassing or discriminatory conduct against a religious institution is enlightening. One noteworthy opinion is *Minker v. Baltimore Annual Conference of United Methodist Church*, 894 *F.*2d 1354 (D.C.Cir.1990), a case in which a minister claimed he was denied a deserved promotion based solely on his age. Minker alleged causes of action for age discrimination under state and federal statutes, as well as for breach of contract based on passages from the church's "Book of Discipline" concerning the assignment of pastorships and based on oral promises made to him by church officials to find him a more suitable congregation. *Id.* at 1355. Because he had since been reassigned, he sought only an injunction against future discrimination and monetary damages. *Id.* at 1356.

The Court of Appeals for the District of Columbia Circuit affirmed the dismissal of Minker's statutory age discrimination claims because their resolution (examining the church's reasons for passing over Minker) would permit the courts to interfere with

the church's autonomy to make a pastoral appointment determination. *Id.* at 1357. However, *Minker* permitted further review of an oral contract claim, explaining that "[a] church is always free to burden its activities voluntarily through contracts, and such contracts are fully enforceable in civil court." *Id.* at 1359 (citing *Watson v. Jones,* 80 *U.S.* (13 Wall.) 679, 714, 20 *L.Ed.* 666, 670 (1871)). The court squarely rejected the argument, similar to the one here advanced by defendants, that even proving *the existence* of a contract would require an inquiry into subjective, spiritual, and ecclesiastical matters that would violate the First Amendment. *Id.* at 1359–60. Although it agreed that the employment contract alleged by Minker "threatens to touch the core of the rights" protected by the Free Exercise Clause, and that "any inquiry into the Church's *reasons* for asserting that Minker was not suited for a particular pastorship would constitute an excessive entanglement in its affairs," *id.* at 1360 (emphasis added), the court nevertheless found it premature to foreclose the oral contract claim on a motion to dismiss. *Id.* at 1360–61. It reasoned that

the first amendment does not immunize the church from all temporal claims made against it. As we noted in *Costello Publishing Co. v. Rotelle,* 670 *F.*2d 1035 (D.C.Cir.1981), appellant need show only that *some* form of inquiry is permissible and *some* form of remedy is available to survive a motion to dismiss. . . . [We] noted that summary judgment was inappropriate because the trial court should at least consider the circumstances of the alleged activity to determine whether a religious concern existed and whether a nonintrusive remedy could be fashioned.

We find that appellant should be allowed to demonstrate that he can prove his case without resorting to impermissible avenues of discovery or remedies. As a theoretical matter, the issue of breach of contract can be adduced by a fairly direct inquiry into whether appellant's superintendent promised him a more suitable congregation, whether appellant gave consideration in exchange for that promise, and whether such congregations became available but were not offered to Pastor Minker. Similarly, Minker's injury can be remedied without court oversight. Money damages alone would suffice since Minker already has a new pastorship. Maintaining a suit, by itself, will not necessarily create an excessive entanglement. Furthermore, as the remedy would be limited to the award of money damages, we see no potential for distortion of church appointment decisions from requiring that the Church not make empty, misleading promises to its clergy.

It could turn out that in attempting to prove his case, appellant will be forced to inquire into matters of ecclesiastical policy even as to his contract claim. Of course, in that situation, a court may grant summary judgment on the ground that appellant has not proved his case and pursuing the matter further would create an

excessive entanglement with religion. On the other hand, it may turn out that the potentially mischievous aspects of Minker's claim are not contested by the Church or are subject to entirely neutral methods of proof. The speculative nature of our discussion here demonstrates why it is premature to foreclose appellant's contract claim. Once evidence is offered, the district court will be in a position to control the case so as to protect against any impermissible entanglements. Thus, while the first amendment forecloses any inquiry into the Church's assessment of Minker's suitability for a pastorship, even for the purpose of showing it to be pretextual, it does not prevent the district court from determining whether the contract alleged by Minker in fact exists.

[*Ibid.* (internal citations omitted) (emphasis in original).]

In sum, *Minker* would allow a minister "to prove up his claim of breach of an oral contract to the extent that he can divine a course clear of the Church's ecclesiastical domain." *Id.* at 1361.

*Bollard v. California Province of the Society of Jesus,* 196 *F.*3d 940 (9th Cir.1999), a case in which the plaintiff's underlying factual allegations are strikingly similar to those of McKelvey, is also instructive. The plaintiff, John Bollard, was a novice of the Society of Jesus, an order of Roman Catholic priests also known as the Jesuits. *Id.* at 944. He alleged that while studying and training to be ordained, his Jesuit superiors subjected him to sexual harassment and unwelcome sexual discussions and advances. *Ibid.* Despite reporting the harassment to superiors, no action was taken to stop the misconduct, and as a result Bollard found himself with no choice but to leave the Jesuit order before taking his vows. *Ibid.* He filed a hostile work environment sexual harassment complaint against the Jesuit order and the individual priests alleging violations of Title VII of the Civil Rights Act of 1964, 42 *U.S.C.* § 2000e–2(a), and state law claims including breach of contract. *Ibid.* The district court held that the ministerial exception barred his Title VII claims, and it declined to exercise supplemental jurisdiction over the state law claims. *Ibid.*

The Ninth Circuit reversed, holding that "[w]here the church provides no doctrinal nor protected-choice based rationale for its alleged actions, and indeed expressly disapproves of the alleged actions, a balancing of interests strongly favors application of" Title VII's ban against sexual harassment; thus, exercising jurisdiction over Bollard's sexual harassment claim "[did] not run afoul

of the Free Exercise Clause." *Id.* at 948. The court further held that because judicial resolution of Bollard's claims would neither implicate the church's freedom to choose its ministers (because the church surely did not contend that sexual harassment was a form of selecting seminarians for ordination) nor require the court to evaluate religious subjects, there were no substantive concerns under the Establishment Clause. *Id.* at 948–49. According to the Ninth Circuit, as a matter of procedural entanglement, adjudication of Bollard's claim would not require continued court surveillance of church activities because Bollard sought only retrospective damages and not equitable relief (such as reinstatement). *Id.* at 949–50. The court thus held that exposing the church to "the expense and indignity of the civil legal process" to the same extent as any private litigant is not sufficiently significant to violate the Establishment Clause. *Ibid.* In sum, where "the defendant church is neither exercising its constitutionally protected prerogative to choose its ministers nor embracing the behavior at issue as a constitutionally protected religious practice," the First Amendment does not bar a plaintiff's claims. *Id.* at 944.

In remanding the case, the court also provided instructions to the district court for reconsideration of Bollard's remaining state law claims, including those for constructive discharge and breach of contract. *Id.* at 950. As in its analysis of the Title VII claim, the Ninth Circuit explained that the state law claims "would run afoul of the Free Exercise Clause" if the *nature of the claims* and *associated remedies* sought would "impinge on the church's prerogative to choose its ministers or to exercise its religious beliefs in the context of employing its ministers." *Ibid.* It noted, for example, that had Bollard sought reinstatement as the remedy for breach of contract—in effect requiring the Jesuits to employ him—that would "interfere with the church's constitutionally protected choice of its ministers." *Ibid.*

Moreover, the Ninth Circuit recognized, in a case involving the sexual harassment of a seminarian, that a cause of action for breach of contract can be adjudicated so long as *analysis of the*

*claim* and *imposition of a remedy* do not interfere with the church's right to select its ministers or to exercise its religious beliefs. *Ibid.; see also Minker, supra,* 894 *F*.2d at 1359 ("[C]ourts may always resolve contracts governing 'the manner in which churches own property, hire employees, or purchase goods.'") (quoting *Jones, supra,* 443 *U.S.* at 606, 99 *S.Ct.* at 3027, 61 *L.Ed.*2d at 786); *Rayburn, supra,* 772 *F*.2d at 1171 (noting that churches may be held liable upon their valid contracts). The critical question is "the degree to which resolving the issues raised by the plaintiff's claims would require intrusion into the spiritual functions of the religious institution at issue." *Smith v. Raleigh District of N.C. Conference of the United Methodist Church,* 63 *F.Supp.*2d 694, 709 (E.D.N.C.1999).

Furthermore, in respect of claims that turned on the alleged tortious failure of a church to take reasonable action to stop the continuation of known sexual harassment by its priests, the *Bollard* court correctly recognized that

it strays too far from the rationale of the Free Exercise Clause to extend constitutional protection to this sort of disciplinary inaction simply because a minister is the target as well as the agent of the harassing activity. That Bollard has sued under an employment discrimination statute does not mean that the aspect of the church-minister employment relationship that warrants heightened constitutional protection—a church's freedom to choose its representatives—is present. *The Free Exercise Clause rationale for protecting a church's personnel decisions* concerning its ministers is the necessity of allowing the church *to choose* its representatives using whatever criteria it deems relevant. That rationale does not apply here, for the [defendants] most certainly do not claim that allowing harassment to continue unrectified is a method of choosing their clergy. Because there is no protected-choice rationale at issue, we intrude no further on church autonomy in allowing this case to proceed than we do, for example, in allowing parishioners' civil suits against a church for the negligent supervision of ministers who have subjected them to inappropriate sexual behavior. *See Martinelli v. Bridgeport Roman Catholic Diocesan Corp.,* 10 *F.Supp.*2d 138 (D.Conn.1998); *Nutt v. Norwich Roman Catholic Diocese,* 921 *F.Supp.* 66 (D.Conn.1995); *Moses v. Diocese of Colorado,* 863 *P.*2d 310 (Colo.1993).

[*Bollard, supra,* 196 *F*.3d at 947–48 (emphasis added).]

Likewise, courts have permitted resolution of breach of fiduciary duty claims brought by parishioners against their churches. For instance, by examining the nature of the cause of action in light of First Amendment principles, this Court in *F.G. v. MacDo-*

*nell,* 150 *N.J.* 550, 696 *A.*2d 697 (1997), recognized that such a claim—which consists simply of proof that the plaintiff trusted and sought counseling from a person in a dominant or superior position and that the trust was violated, *id.* at 563, 565, 696 *A.*2d 697—could be evaluated without resort to the interpretation of religious beliefs or practices. *Id.* at 561, 696 *A.*2d 697. We recognized that "[b]ut for [defendant's] status as a clergyman, his conduct was unrelated to religious doctrine." *Id.* at 566, 696 *A.*2d 697. In another breach of fiduciary duty action brought by a former child parishioner against his diocese, the Second Circuit aptly observed the following:

> To the extent that the jury consider[s] religious teachings and tenets, ... it [does] so to determine not their validity but whether, as a matter of fact, [plaintiff]'s following of the teachings and belief in the tenets gave rise to a fiduciary relationship between [plaintiff] and the Diocese. *The First Amendment does not prevent courts from deciding secular civil disputes involving religious institutions when and for the reason that they require reference to religious matters.* ...
>
> ... Where a person's beliefs are alleged to give rise to a special legal relationship between him and his church, we may be required to consider with other relevant evidence the nature of that person's beliefs in order properly to determine whether the asserted relationship in fact exists. *In doing so, we judge nothing to be heresy, support no dogma, and acknowledge no beliefs or practices of any sect to be the law.*
>
> The obvious distinction between the proper use of religious principles as facts and an improper decision that religious principles are true or false bears a certain family resemblance to the more mundane rules of hearsay. Evidence of a statement made out of court may be inadmissible as hearsay to prove the truth of the facts asserted in it, but may be admissible for the nonhearsay purposes of proving that the statement was made or that other facts can be inferred from the making of the statement. *See Fed.R.Evid.* 801(c). Similarly, the proposition advanced by a particular religion that "a bishop is like a 'shepherd' to the 'flock' of parishioners" cannot be considered by a jury to assess its truth or validity or the extent of its divine approval or authority, but may be considered by the same jury to determine the character of the relationship between a parishioner and his or her bishop.
>
> Finally on this score, we find no merit to the Diocese's claim that [a] judgment violate[s] the First Amendment by determining the Diocese's obligations to its parishioners as a matter of church doctrine. [Plaintiff]'s claim [is] brought under Connecticut law, not church law; church law is not ours to assess or to enforce. *[Plaintiff]'s claim neither relie[s] upon nor [seeks] to enforce the duties of the Diocese according to religious beliefs, nor [does] it require or involve a resolution of whether the Diocese's conduct was consistent with them.*

[*Martinelli v. Bridgeport Roman Catholic Diocesan Corp.*, 196 *F*.3d 409, 431 (2d Cir.1999) (emphasis added).]

*See also Sanders v. Casa View Baptist Church*, 134 *F*.3d 331, 337 (5th Cir.) ( "[D]uties underlying the plaintiff's claims for ... breach of fiduciary duties are not derived from religious doctrine."), *cert. denied sub nom., Baucum v. Sanders*, 525 *U.S.* 868, 119 *S.Ct.* 161, 142 *L.Ed.*2d 132 (1998); *Doe v. Evans*, 814 *So.*2d 370, 375–76 (Fla.2002) (recognizing viability of breach of fiduciary duty claim by parishioner against church and clergy engaged in marital counseling as not violative of Free Exercise or Establishment Clauses where plaintiff did not assert any violation of church tenets as basis for cause of action); *Moses v. Diocese of Colorado*, 863 *P*.2d 310, 320–21 (Colo.1993) (holding that First Amendment did not bar claims of fiduciary duty or negligent hiring and supervision against clergy and their superiors; such claims "do not involve disputes within the church and are not based solely on ecclesiastical or disciplinary matters"), *cert. denied*, 511 *U.S.* 1137, 114 *S.Ct.* 2153, 128 *L.Ed.*2d 880 (1994); *Erickson v. Christenson*, 99 *Or.App.* 104, 781 *P*.2d 383, 386 (1989) (rejecting argument that claim of breach of fiduciary duty is actually clerical malpractice claim requiring imposition of standard of care involving examination of religious beliefs in violation of First Amendment; breach of fiduciary duty claim merely requires proof of "existence and breach of a confidential relationship").

V

The principles of First Amendment jurisprudence distilled from our review of the relevant case law are as follows: Before barring a specific cause of action, a court first must analyze each element of every claim and determine whether adjudication would require the court to choose between "competing religious visions," or cause interference with a church's administrative prerogatives, including its core right to select, and govern the duties of, its ministers. In so doing, a court may "interpret provisions of religious documents involving property rights and other nondoctrinal matters as long as the analysis can be done in

purely secular terms." *Minker, supra,* 894 *F.*2d at 1358 (citing *Jones, supra,* 443 *U.S.* at 600–01, 99 *S.Ct.* at 3024, 61 *L.Ed.*2d at 783). The court must next examine the remedies sought by the plaintiff and decide whether enforcement of a judgment would require excessive procedural or substantive interference with church operations.

If the answer to either of those inquiries is in the affirmative, then the dispute *is* truly of a *religious nature,* rather than theoretically and tangentially touching upon religion, and the claim is barred from secular court review. If, however, the dispute can be resolved by the application of purely neutral principles of law and without impermissible government intrusion (e.g., where the church offers no religious-based justification for its actions and points to no internal governance rights that would actually be affected), there is no First Amendment shield to litigation.

That is so even when the dispute arises from activity that occurred in a religious setting, such as a relationship between a church and a ministerial-type plaintiff. To sweep away all of a minister's or seminarian's claims against the church out of fear of encroaching upon the First Amendment not only neglects, but actually may intrude upon, the two overarching purposes for which the Religion Clauses stand: (1) preventing "sponsorship, financial support, and active involvement of the sovereign in religious activity," *Walz v. Tax Comm'n,* 397 *U.S.* 664, 668, 90 *S.Ct.* 1409, 1411, 25 *L.Ed.*2d 697, 701 (1970); and (2) promoting the freedom of an individual "to believe and profess whatever religious doctrine [he or she] desires," *Employment Div. v. Smith,* 494 *U.S.* 872, 877, 110 *S.Ct.* 1595, 1599, 108 *L.Ed.*2d 876, 884 (1990), and of churches "to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of the Russian Orthodox Church in N. Am.,* 344 *U.S.* 94, 116, 73 *S.Ct.* 143, 154–55, 97 *L.Ed.* 120, 136 (1952). The Fifth Circuit has made the point concisely:

> The First Amendment does not categorically insulate religious relationships from judicial scrutiny, for to do so would necessarily extend constitutional protection to

the secular components of these relationships.... [T]he constitutional guarantee of *religious* freedom cannot be construed to protect *secular* beliefs and behavior, *even when they comprise part of an otherwise religious relationship*.... To hold otherwise would impermissibly place a religious leader in a preferred position in our society.

[*Sanders, supra,* 134 *F.*3d at 335–36 (third emphasis added).]

Declining to impose neutral and otherwise applicable tort or contract obligations on religious institutions and ministers may actually support the establishment of religion, because to do so effectively creates an *exception* for, and may thereby help *promote,* religion. Fenton, *supra,* 8 *Mich. J. Gender & L.* at 75; *see also Jones v. Trane,* 153 *Misc.*2d 822, 591 *N.Y.S.2d* 927, 932 (N.Y.Sup.Ct.1992) ( "[A] contrary holding—that a religious body must be held free from any responsibility for wholly predictable and foreseeable injurious consequences of personnel decisions, although such decisions incorporate no theological or dogmatic tenets—would go beyond First Amendment protection and cloak such bodies with an exclusive immunity greater than that required for the preservation of the principles constitutionally safeguarded."); Shawna Meyer Eikenberry, Note, *Thou Shalt Not Sue the Church: Denying Court Access to Ministerial Employees,* 74 *Ind. L.J.* 269, 284 (1998) ( "[L]ower courts ... have blindly applied the *Lemon* test, concentrating exclusively on the third prong, excessive entanglement, without considering the fact that an exemption [from neutral laws] may have the [effect] of advancing religion.... [B]y allowing religious organizations immunity from discrimination suits brought by their clergy, courts give them an advantage that no secular employer enjoys.").

## VI

Applying the aforementioned principles to the case before us, it seems clear that the lower courts erred in two respects in dismissing McKelvey's complaint. First, they failed to recognize that the protections afforded to churches by the Religion Clauses of the First Amendment are highly nuanced and not monolithic. Second, they failed to analyze each and every claim contained in McKelvey's complaint to determine whether adjudication would

require a determination of competing religious visions or interfere with church administration or choice.

McKelvey's relationship with the Diocese as a seminarian is not an automatic bar to the justiciability of an otherwise secular dispute. *Bollard, supra,* 196 *F.*3d at 948, 950; *Minker, supra,* 894 *F.*2d at 1360. The First Amendment is not violated so long as resolution of a claim does not require the court to choose between competing interpretations of religious tenets or to interfere with a church's autonomy rights. Churches and their ministers are not above the law and may be held liable for tortious conduct or contractual undertakings.

It is simply not correct to conclude that secular courts lack jurisdiction to hear any dispute between a ministerial-type plaintiff and his or her church. The critical factor in the application of the ministerial exception to a given cause of action must be that resolution of the claim requires an impermissible inquiry into the propriety of a *decision* of core ecclesiastical concern, a decision, in other words, where the *dispute* truly is *religious.* To be sure, where an ecclesiastically-based action clearly is present, such as the propriety of a church's *choice* concerning the hiring, termination, relocation, benefits, or tenure of a person whose function at the church concerns the propagation of its faith, the First Amendment shields the religious organization from suit. That is not the case here. No choice regarding McKelvey's ordination or employment was exercised by the Diocese.

The lower courts refused to even entertain McKelvey's complaint for fear of offending First Amendment tenets. *McKelvey, supra,* 342 *N.J.Super.* at 419, 776 *A.*2d 903 ("We are most reluctant to entertain plaintiff's ... claim here for fear of encroachment on church administration and polity in a sensitive matter of considerable contemporary concern.") (citing Garry Wills, *Papal Sin* 192–203 (Doubleday 2000)).

At the heart of McKelvey's case is his contention that defendants subjected him to sexual harassment. On the basis of

established precedent, if he had filed a timely complaint under Title VII the case could have proceeded without any First Amendment problems. *Bollard, supra,* 196 *F.*3d at 944. Obviously, sexual harassment is not doctrinally based, a protected choice, or inherent in church administration. *Van Osdol v. Vogt,* 908 *P.*2d 1122, 1129 & n. 11 (Colo.1996) (observing that hostile work environment claims "that do not stem directly from a hiring or discharge decision" would not be barred by First Amendment); *Black v. Snyder,* 471 *N.W.*2d 715, 720 (Minn.Ct.App.1991) (holding that sexual harassment claims involving conduct occurring during pastor's employment relationship were "unrelated to pastoral qualifications or issues of church doctrine"). Neither would monetary damages therefor impermissibly entangle church and state. *Bollard, supra,* 196 *F.*3d at 950; *Minker, supra,* 894 *F.*2d at 1360; *Black, supra,* 471 *N.W.*2d at 721 (noting that monetary damages remedy sought "would not require extensive court oversight"). Thus, there would have been no First Amendment prohibition against McKelvey's proving a Title VII case of sexual harassment.

This case differs from a Title VII action in form, although the underlying wrongful conduct is alleged to be the same. Clearly, as in a Title VII case, McKelvey can attempt to prove that he was sexually harassed by defendants, resulting in his leaving the seminary before he could be considered for ordination. The issue is whether his claim that those acts constituted a breach of contract (implied in fact and law) for education and training; a breach of covenant of good faith and fair dealing; a breach of fiduciary duty; intentional infliction of emotional distress; and fraud and deceit can proceed.

We think McKelvey should have an opportunity to demonstrate that he can prove the existence of a contract with the Diocese for education and training without offending First Amendment principles. That would include evidence of oral and written representations, conduct, and all other relevant surrounding circumstances. The fact that such evidence may be contained in documents with religious overtones does not preclude its use to establish the

existence of a contractual relationship between McKelvey and the Diocese. *Martinelli, supra,* 196 *F.*3d at 431; *Minker, supra,* 894 *F.*2d at 1358. As long as the analysis is confined to the fact of the contract for education and training and does not require a choice between competing interpretations of dogma or interfere with church administration, no First Amendment bar is presented.

However, McKelvey may not rely on evidence regarding the ·vow of celibacy or other church teachings on sexual behavior to establish that his contract bore with it an implied promise that he would be free from sexual harassment. Such an inquiry would require a court to interpret the celibacy vow and related doctrine in contravention of the First Amendment's guarantees. But McKelvey may argue that, like all similar secular contracts, his agreement with the Diocese carried with it a covenant of good faith and fair dealing that defendants' conduct violated. *Wilson v. Amerada Hess Corp.,* 168 *N.J.* 236, 245, 773 *A.*2d 1121 (2001) (explaining that "[g]ood faith performance or enforcement of a contract ... excludes a variety of types of conduct characterized as involving 'bad faith' because they violate community standards of decency, fairness or reasonableness") (quoting *Restatement (Second) of Contracts* § 205 cmt. a (1981)).

Even if McKelvey can prove a contract and a breach of the covenant of good faith and fair dealing, as we have indicated, he cannot compel ordination or employment with the church. *See, e.g., EEOC v. Catholic Univ. of Am.,* 83 *F.*3d 455, 467 (D.C.Cir. 1996) (holding that Religion Clauses barred nun's Title VII claim for denial of tenure); *Young v. Northern Ill. Conference of United Methodist Church,* 21 *F.*3d 184, 187–88 (7th Cir.) (holding that Free Exercise Clause precluded Title VII sex and race discrimination claim for denial of promotion and discontinuance of minister status), *cert. denied,* 513 *U.S.* 929, 115 *S.Ct.* 320, 130 *L.Ed.*2d 281 (1994); *Rayburn, supra,* 772 *F.*2d 1164, 1171–72 (4th Cir.1985) (holding that Religion Clauses barred Title VII sex and race discrimination claims for denial of pastoral position). Clearly, the ministerial exception interdicts any claims for ordination and

employment as a priest and, to that extent, the motion to dismiss was properly granted. However, McKelvey might, without offending First Amendment principles, seek money damages for the benefit defendants received from his free or reduced cost labor as an "intern" in various diocesan churches and, based on Auxiliary Bishop Schad's letter, seek an order prohibiting defendants from attempting to recoup the $69,000 tuition, book and fee costs.

It seems to us as well that it is also possible that, without implicating dogma, ecclesiastical policy or choice, McKelvey could satisfy the elements of a breach of fiduciary duty as set forth in *F.G.*:

> The essence of a fiduciary relationship is that one party places trust and confidence in another who is in a dominant or superior position. A fiduciary relationship arises between two persons when one person is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship. *Restatement (Second) of Torts* § 874 cmt. a (1979); *see In re Stroming's Will,* 12 *N.J.Super.* 217, 224, 79 *A.2d* 492 (App.Div.), *certif. denied,* 8 *N.J.* 319, 85 *A.2d* 272 (1951) (stating essentials of confidential relationship "are a reposed confidence and the dominant and controlling position of the beneficiary of the transaction"); *Blake v. Brennan,* 1 *N.J.Super.* 446, 453, 61 *A.2d* 916 (Ch.Div.1948) (describing "the test [as] whether the relationship between the parties were of such a character of trust and confidence as to render it reasonably certain that the one party occupied a dominant position over the other"); Bogert, *Trusts and Trustees* 2d § 481 (1978) (stating "[t]he exact limits of the term 'fiduciary relation' are impossible of statement. Depending upon the circumstances of the particular case or transaction, certain business, public or social relationships may or may not create or involve a fiduciary character."). The fiduciary's obligations to the dependent party include a duty of loyalty and a duty to exercise reasonable skill and care. *Restatement (Second) of Trusts* §§ 170, 174 (1959). Accordingly, the fiduciary is liable for harm resulting from a breach of the duties imposed by the existence of such a relationship. *Restatement (Second) of Torts* § 874 (1979).
>
> [*F.G. v. MacDonell, supra,* 150 *N.J.* at 563–64, 696 *A.2d* 697.]

Presumably testimony could establish, as a fact, the hierarchical structure in seminary education; that the mentors and spiritual director defendants were, in that hierarchy, in dominant positions over McKelvey; that they were persons to whom a seminarian was expected to turn for counseling and guidance; and that they violated the duty of trust implicit in the relationship. Such evidence would not be admitted for an assessment of its "truth or validity or the extent of its divine approval or authority," *Marti-*

*nelli, supra,* 196 *F.*3d at 431, but only to establish the character of defendants' relationship with McKelvey.

If established, those claims, and others lurking in the margins of McKelvey's complaint, could give rise to monetary damages, the imposition of which would not excessively entangle church and state. As indicated, McKelvey's complaint encompasses a number of claims, including other contract theories; intentional infliction of emotional distress; and fraud, misrepresentation and deceit. He also seeks emotional distress and lost chance damages. When those causes of action and prayers for relief are fully explicated by McKelvey, they may or may not individually survive defendants' motion. Our examples merely underscore the theoretical potential for some of McKelvey's claims to pass muster and our conviction that the lower courts' wholesale rejection of McKelvey's complaint cannot withstand scrutiny. Upon remand, McKelvey should be given an opportunity to demonstrate how each of his claims can be litigated without offending First Amendment principles. Compare *Elmora Hebrew Ctr. v. Fishman,* 125 *N.J.* 404, 420, 593 *A.*2d 725 (1991) ("It is imperative, in order to avoid unconstitutional entanglements of civil and religious issues and to preserve the right to civil adjudication of secular disputes, for a trial court to specify which issues are religious . . .; and which issues are civil and to be resolved by the court.").

## VII

One final note. In ruling as we have, we express no opinion about the merits of McKelvey's claim that he was sexually harassed and, if he can prove it, whether he suffered any recoverable damages as a result. Neither have we considered any of defendants' potential defenses, nor whether relevant statutes of limitations bar any of McKelvey's claims. As noted, defendants moved to dismiss solely on the ground that the First Amendment prohibited secular court jurisdiction; they have yet to file an answer. Depending on which, if any, of McKelvey's claims survive defendants' motion, some or all of those issues will require resolution.

## VIII

The judgment of the Appellate Division is reversed. The case is remanded to the trial court for proceedings consistent with the principles to which we have adverted.

For reversal and remandment—Chief Justice PORITZ and Justices STEIN, COLEMAN, LONG, VERNIERO, LaVECCHIA and ZAZZALI—7.

*Opposed*—None.