**INDUSTRIAL MARITIME CARRIERS (BAHAMAS), INC., and Intermarine Inc., Appellants,**

v.

**Thomas MILLER (Americas) Inc.; Thomas Miller (Miami), Inc.**

No. 10–1232.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit LAR 34.1(a) Oct. 6, 2010.

Filed: Oct. 7, 2010.

On Appeal from the United States District Court for the District of New Jersey (D.C. No. 06–cv–5625), District Judge: Hon. Joseph A. Greenaway, Jr.

Andrew R. Brown, Esq., Hill, Rivkins & Hayden, New York, NY, Robert G. Clyne, Esq., Hill, Rivkins & Hayden, Hoboken, NJ, James A. Saville, Jr., Esq., Hill, Riv-

kins & Hayden, South Amboy, NJ, for Plaintiff–Appellant.

Jack A. Greenbaum, Esq., Blank Rome, New York, NY, for Defendant–Appellee.

Before: FUENTES, JORDAN and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

JORDAN, Circuit Judge.

Industrial Maritime Carriers (Bahamas), Inc. ("IMB") and its managing agent, Intermarine, Inc. ("Intermarine") appeal an order from the United States District Court for the District of New Jersey granting summary judgment in favor of Thomas Miller (Americas), Inc. ("TMA") and Thomas Miller (Miami), Inc. ("TMM") on IMB's[1] claims against TMM[2] for negligence and breach of fiduciary duty. For the reasons that follow, we will affirm.

## I. Background

Because we write solely for the parties, who are well acquainted with the lengthy and complex factual history of this case, we will discuss only those facts necessary to address the arguments raised on appeal. At all material times, IMB was a Bahamian corporation with an office in New Orleans, Louisiana, and was an operator of ocean cargo vessels. Intermarine was a Louisiana corporation and acted as IMB's managing agent. TMA was a New Jersey corporation and a correspondent of Thomas Miller (Bermuda) Ltd. ("TMB"), which managed the United Kingdom Mutual Steam Ship Assurance Association (Bermuda) Limited ("the UK Club"), a nonprofit marine mutual protection and indemnity association (a "P & I club").

TMM was a Florida corporation with its office in Miami and a correspondent of TMA.

IMB initiated this lawsuit alleging that TMM breached a duty to notify it of a lawsuit pending against IMB in Turkey involving IMB's alleged misdelivery of cargo aboard a vessel known as the M/V Amderma ("Amderma"). IMB claims that, as a result of TMM's purported breach of its duty to notify IMB of the Turkish lawsuit, IMB was unable to participate in its own defense, which ultimately led to an adverse judgment against it in Turkey.

### A. Factual History

On June 2, 1997, IMB entered into a contract of carriage with Centrans International Corporation ("Centrans"), as agent for Daewoo Corporation, to transport a cargo of construction equipment from Korea to Turkey aboard a vessel known as the M/V Industrial Bridge ("Industrial Bridge"), which IMB chartered from its affiliate Bridge Shipping, Inc. On July 3, 1997, IMB entered into a second contract of carriage with Centrans, as agent of Daewoo, to carry an additional cargo of construction equipment between the same two ports, this time aboard the Amderma, which IMB chartered from Far Eastern Shipping Company ("FESCO").

IMB appointed Barwil Universal Denizcilik ve Tasimacilik ("Barwil") as its agent in Turkey for both the Industrial Bridge and the Amderma. IMB also obtained insurance for misdelivery claims in connection with cargo shipped aboard both the Amderma and the Industrial Bridge with insurers at Lloyd's of London under a Ship Owner's Liability ("SOL") policy.

1. For simplicity's sake and except where context dictates otherwise, references to "IMB" throughout this opinion are meant to include both IMB and Intermarine.

2. For simplicity's sake and except where context dictates otherwise, references to "TMM" throughout this opinion are meant to include both TMM and TMA.

With respect to marine insurance and indemnity coverage, however, IMB insured the Industrial Bridge and the Amderma by entering the vessels into different P & I clubs. The Industrial Bridge was entered into the German P & I club Trampfahrt Betriebs–Risiko–Versichertung fur Seefrachtschiffe a.G. ("Trampfahrt"), while the Amderma was entered into the UK Club.

The Industrial Bridge and the Amderma arrived in Turkey in July and August 1997, respectively. Pursuant to IMB's understanding of earlier instructions it received from Centrans, IMB instructed Barwil to release the cargoes from both ships upon arriving in Turkey without requiring the receivers of the cargo to present the original bills of lading. Accordingly, Barwil discharged the cargoes into a bonded warehouse under the control of the Turkish Customs Authority upon arriving in Turkey. In mid-March 1998, the Turkish Customs Authority apparently released the cargoes that had been aboard the Industrial Bridge and the Amderma to a Turkish corporation called BMG.

On July 29, 1998, Barwil notified IMB that it had been served with a "payment order," [3] from Daewoo, demanding compensation for the alleged misdelivery of cargo aboard the Industrial Bridge. The payment order was addressed to Barwil individually and as agent for the Industrial Bridge's owners and charterers. At this point, IMB should have notified its SOL insurer (i.e., Lloyd's of London) or at least the P & I club in which the Industrial Bridge had been entered (i.e., Trampfahrt). Instead, on July 30, 1998, IMB's in-house counsel and claims manager, Thomas Schowodski, erroneously believing that the Industrial Bridge had been entered

into the UK Club, sent TMM a telefax notifying it of the Industrial Bridge payment order and requesting "the UK Club's kind assistance in providing competent maritime legal defense attorney to assist our agent [and] . . . respond to the legal demand." (App. at 213–14.)

On July 30, 1998, TMM responded to IMB's telefax advising that "we will be passing this to our correspondents for their urgent attention/comments/action immediately. We will keep you advised of developments." (App. at 724.) Later that day, TMM instructed its correspondent in Turkey, Vitsan Istanbul ("Vitsan"), to investigate the Industrial Bridge payment order and, if necessary, to appoint a lawyer on behalf of IMB to contest the payment order.

On July 31, 1998, Vitsan informed TMM that Barwil had engaged an attorney named Turgut Basacik to object to the payment order on its behalf and suggested that Basacik also be appointed on behalf of IMB. TMM then notified IMB that "Barwils [sic] have already appointed a local lawyer—T. Basacik, who is well known to the correspondents. We assume that you have no objection to his appointment on your behalf. We will advise Vitsan accordingly." (App. at 736.) Having heard no objection from IMB, TMM advised Vitsan that "[w]e wish to confirm that we have no objection to the appointment of the lawyer T. Basacik on behalf of [IMB]." (App. at 735.) Basacik was then appointed as counsel on behalf of IMB and made the necessary objections to the Industrial Bridge payment order.

In August 1998, Barwil received another payment order from Daewoo, this time demanding payment for the alleged misde-

---

**3.** Under Turkish law, a payment order is a demand for payment. It has no effect if the respondent files an objection within seven days, except that it tolls the statute of limita- tions and the claimant may recover certain costs if the objections were wrongfully filed. The claimant then has one year within which to file suit.

livery of cargo aboard the Amderma. Barwil forwarded the Amderma payment order directly to Basacik, who then filed a timely objection.

On October 13, 1998, Daewoo filed suit in Turkish court for the alleged misdelivery of cargoes aboard the Industrial Bridge and the Amderma. The lawsuit named as defendants Barwil and the owners, charterers, captains, and operators of the Industrial Bridge and the Amderma. Also in October 1998, Barwil's "Errors & Omissions" insurer engaged an attorney named Izzet J. Hatem to represent Barwil in connection with the Industrial Bridge and Amderma lawsuit, while IMB continued to be represented by Basacik. Even after Barwil retained separate counsel, however, Hatem and Basacik worked together and "prepar[ed] the defense of Barwil and of [IMB] at the same time jointly." [4] (App. at 280.)

On February 24, 1999, TMM learned that the Industrial Bridge had not been entered into the UK Club. However, it was not until over a year later, on March 23, 2000, that TMM notified IMB of that fact. Further, IMB claims that TMM never notified IMB of the Turkish lawsuit.

IMB claims that it did not learn of the pending lawsuit against it in Turkey until late November 2002, over three years after it learned of the first payment order in July 1998. However, IMB admittedly received a telefax from Barwil on February 17, 1999 stating:

> Ref: M/V Industrial Bridge
>
> M/V Amderma
>
> This is to inform you that two court cases were opened against Barwil Turkey in Istanbul by Daewoo and Centrans Korea.
>
> Please advise if there is any court cases opened against Intermarine Inc. in USA, kindly revert with date, place of the court case if any.

(App. at 76: ¶ 57; 262–63, 881: ¶ 57.) [5] Further, on March 24, 2000, Intermarine

---

4. When Basacik passed away in May 2000, Barwil instructed Hatem, to represent IMB/Intermarine's interests in the Turkish lawsuit. During his deposition, Hatem testified as follows:

Q: We were talking about when you started to represent all defendants. When was that?

A: I'll tell you. In fact, as I'm telling you, unofficially, not unofficially but in practice as we were preparing the defense of Barwil and of the companies at the same time jointly, I may say that my work was also— my activity was also in favor of these companies.

But in 2000, ... Mr. Basacik passed away, died. Then ... Barwil instructed me and said, "In any case, you are handling the case in a way which is also securing or helping for the defense of the other defendants, so there is no point in appointing another lawyer. Please continue to do so for everybody." ...

Q: Right. You said before Mr. Basacik died, you worked with Mr. Basacik in preparing the defenses?

A: Exactly.

Q: Can you—I mean, I take it then you had meetings with him and discussed the case with him—

A: Yes.

Q:—and you agreed on what defenses would complement each other?

A: Yes, sir.

(App. at 280.)

5. Barwil sent four additional telefaxes referencing the Turkish lawsuit, three of which IMB denies receiving. On February 23, 1999, Barwil sent IMB a telefax requesting copies of IMB's charterparties, which IMB's in-house counsel and claims manager, Thomas Schowodski, declined to provide. On February 25, 1999, Barwil allegedly sent a telefax to IMB's Dan Yeager, under a reference to M/V Amderma and M/V Industrial Bridge, referring to Schodowski's refusal to provide the charterparties, and stating:

> We kindly ask you to explain the seriousity [sic] of this matter to Mr. Schodovski because these two cases are also opened against your company as well as our side.

sent its German P & I club, Trampfahrt, the following telefax:

When this matter first came to our attention, Tom Schodowski did not realize that the coverage for this matter would fall to the Trampfahrt and contacted the UK P & I Club, who instructed their correspondent in Turkey to look into the matter. The UK Club subsequently learned that the Bridge had not entered in the Club and as Barwil had appointed counsel to represent them the UK Club withdrew any further support.

To our knowledge the matter is continuing to be handled by Barwil and we are trying to locate the balance of our file on this matter. Once we do, we will provide additional information to you.

The purpose of this fax is to cover two points. First, the UK Club has passed to us for payment the invoice for services provided by their correspondent, Vitsan, in the amount of USD 1,875. We would appreciate you placing this expense before the Trampfahrt for payment. Attached is some of the correspondence at the time on this matter for their review.

The second point is we do not wish to contact Barwil for an update as we do not wish to awaken a sleeping dog; however, we would like the Trampfahrt's correspondent in Turkey to discreetly check out the status of this matter. (by court records or Barwil's counsel, Turgut Basacik, on a non disclosure basis.) They might wish to appoint Vitsan as they have some knowledge of the matter.

(App. at 275–76.)

On May 27, 2003, approximately six months after IMB claims to have learned of the lawsuit, the Commercial Court of First Instance in Turkey entered judgment against IMB with respect to the Industrial Bridge and Amderma lawsuit. On October 16, 2003, IMB appealed the judgment of the Commercial Court of First Instance to the Court of Cassation. During the pendency of the appeal, IMB posted a bond in the amount of $4.35 million, as required by the letter of indemnity given to FESCO, to prevent seizure of the Amderma pursuant to a maritime lien provided to Daewoo under Turkish law. On October 27, 2005, IMB paid Daewoo $1.55 million to settle the litigation.

### B. Procedural History

On November 22, 2006, IMB filed a complaint in the United States District Court for the District of New Jersey, which was later amended on September 26, 2007, asserting claims against TMM for negligence and breach of fiduciary duty.

---

You may consider two claims time-barred and decision of Turkish court maybe not applying in U.S. but your future shipments to Turkey may be in difficulties.

This is the first telefax that IMB denies receiving. On May 5, 1999, Intermarine responded to Barwil's request for the original Amderma bills of lading for the Daewoo cargo by saying IMB did not issue any bills of lading. On May 14, 1999, Barwil allegedly sent IMB a telefax under the reference "AMDERMA Voy. 341," regarding the Amderma's bills of lading, stating:

Also our/your lawyers asking for original endorsed Bs/L to prove to the court which you stated submitted to your office in Ko- rea. It is very important, also for your benefit, to send us originals for the court.

This is the second telefax that IMB denies receiving. On September 28, 2000, Barwil allegedly sent a telefax to IMB, with a reference to the two ships and the Court's docket numbers, stating:

Please be informed that the report produced by the panel of experts is negative from all defendants point of view.

The lawyers will be preparing an objection to this report.

You will no doubt be informed in detail thru the club via the lawyers.

This is the third telefax that IMB denies receiving.

IMB alleged that TMM had "the duty and obligation to notify [IMB] ... of the existence of the AMDERMA claim and lawsuit in a prompt and timely manner so that an effective defense could be presented," (App. at 53), and that TMM's failure to do so prevented IMB from participating in their own defense and ultimately caused the adverse judgment against it in Turkey.[6] Specifically, IMB alleged that the attorney representing it in the Turkish litigation failed to raise certain preliminary defenses on its behalf and that, had those defenses been raised, the claims against IMB would have been dismissed. On March 20, 2009, TMM moved for summary judgment, arguing that it did not have a duty to notify IMB of the Amderma lawsuit and that any injury that IMB suffered from the Turkish litigation was not caused by TMM's failure to notify. The parties agreed that New Jersey state law governed the claims.

IMB submitted a legal opinion from a Turkish law expert claiming that the attorneys representing IMB in the Turkish lawsuit failed to raise certain preliminary defenses on its behalf and that, had those defenses been raised, the claims against it would have been dismissed. TMM also submitted a legal opinion from a Turkish expert, who concluded that "[t]he counsels of the defendants Turgut Basacik and Izzet Hatem submitted all appropriate defenses and evidences in the court of first instance. Moreover, in my opinion even if another counsel would have represented the defendants the result would not change, because the legal facts were clear." (App. at 950.)

On December 21, 2009, the District Court granted summary judgment in favor of TMM for two reasons. First, the District Court held that IMB failed to show that TMM had a duty, under negligence law or as a fiduciary of IMB, to inform it of the Amderma claim, stating:

> [IMB] ha[s] identified no course of conduct, contractual provision, or UK Club rule, that would create such an expectation. [IMB] also do[es] not assert that [TMM][was] [IMB's] agent[ ] for service of process. The statements from [TMM's] marketing materials do not suggest that [TMM] will notify members whenever a lawsuit is filed against them any where in the world.

*Indus. Mar. Carriers (Bahamas), Inc. v. Thomas Miller (Americas), Inc.,* 2009 WL 5216971, at *6 (D.N.J. Dec.29, 2009). Second, the District Court held that "even if [IMB] could establish a duty to notify [IMB] about the existence of the lawsuit, and breach of that duty, [IMB] still would face an insurmountable hurdle—[failure] to raise a genuine issue as to a material fact regarding causation." *Id.* at *7. The Court reasoned that:

> [IMB] ha[s] not provided any evidence that would support a conclusion that had [TMM] promptly notified [IMB] of the Amderma lawsuit, [IMB] would have assisted in their own defense, and that had [IMB] had the opportunity to assist in their own defense, [IMB] would have prevailed in the lawsuit[ ].... [IMB] ha[s] not explained what, if any, efforts [they] made to participate in their own defense in the six months between the call from Barwil, which allegedly gave [IMB] the first notification of the Amderma lawsuit, and the date of the hearing in Turkey.

*Id.*

---

6. IMB's complaint does not allege that TMM had a duty to notify IMB of the Industrial Bridge claim.

## II. Discussion[7]

We exercise plenary review over orders granting summary judgment. *Lauren v. DeFlaminis,* 480 F.3d 259, 265–66 (3d Cir. 2007). Thus, we will affirm the District Court's order if our review reveals that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Id.* at 266. In determining whether summary judgment is warranted, we review the facts in the light most favorable to the non-moving party, and draw all reasonable factual inferences in the party's favor. *Id.*

In order to sustain a cause of action for negligence under New Jersey state law, "a plaintiff must prove four core elements: (1) a duty of care, (2) a breach of that duty, (3) proximate cause, and (4) actual damages." *Polzo v. County of Essex,* 196 N.J. 569, 960 A.2d 375, 384 (2008). A fiduciary relationship arises under New Jersey law when "one person is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship." *McKelvey v. Pierce,* 173 N.J. 26, 800 A.2d 840, 859 (2002). A fiduciary is charged with "a duty of loyalty and a duty to exercise reasonable skill and care" on behalf of the person to whose benefit the fiduciary acts. *Id.* "[T]he fiduciary is liable for harm resulting from a breach of the duties imposed by the existence of such a relationship." *Id.*

We agree with the District Court that, even if TMM had a duty to notify IMB of the Amderma lawsuit, IMB has still failed to raise a genuine issue of fact with regard to causation because the link between TMM's failure to notify IMB of the Amderma suit and the injury suffered by IMB is too speculative and attenuated. *See City of Philadelphia v. Beretta U.S.A.*

*Corp.,* 277 F.3d 415, 423 (3d Cir.2002) ("[A] plaintiff who cannot establish some direct relation between the injury asserted and the injurious conduct alleged fails to plead a key element for establishing proximate causation, independent of and in addition to other traditional elements of proximate cause.") (quotations and citations omitted). According to IMB, its injury was caused by its attorneys' failure to raise certain preliminary defenses in the Turkish lawsuit. However, it is undisputed that, on July 30, 1998, IMB was aware of the Industrial Bridge payment order and specifically requested TMM to appoint an attorney to assist in IMB's defense and that IMB did not voice any objection to Turgut Basacik being appointed on its behalf. More importantly, IMB has offered no explanation as to how TMM's alleged failure to notify IMB of the Amderma lawsuit caused Basacik's failure to raise the preliminary defenses that would have allegedly changed the outcome of the Turkish litigation.

There is nothing from which a reasonable juror could infer that, had IMB learned of the Amderma lawsuit, IMB would have proceeded differently in its own defense. IMB does not deny receiving a telefax from Barwil on February 17, 1999, informing it that "two court cases were opened against Barwil ... in Istanbul by Daewoo and Centrans," (App. at 262–63,) or the fact that, on March 23, 2000, Intermarine sent a telefax to Trampfahrt, stating "we do not wish to contact Barwil for an update as we do not wish to awaken a sleeping dog; however, we would like the Trampfahrt's correspondent in Turkey to discreetly check out the status of this matter." (App. at 274–76.) Moreover, IMB did not engage separate

---

7. The District Court had diversity jurisdiction pursuant to 28 U.S.C. § 1332. There is complete diversity of citizenship between IMB/Intermarine and TMM/TMA, and the amount in controversy exceeds $75,000. We have jurisdiction pursuant to 28 U.S.C. § 1291.

Turkish counsel during the six months between the time it admits having actual knowledge of the Amderma lawsuit in November 2002 and May 27, 2003, when the Turkish court entered judgment against IMB.

### III.  Conclusion

For the foregoing reasons, we will affirm the order of the District Court granting summary judgment in favor of TMM.